[Civ. No. 28822.   Second Dist., Div. Four.   Dec. 5, 1966.]

THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Plaintiff and Respondent, v. JAMES STEWART COMPANY, Defendant and Appellant.

822

Ives, Kirwan & Dibble and Martin J. Kirwan for Defendant and Appellant.

John J. Balluff, Matthew H. Witteman, Henry M. Moffat and Richard K. Knowlton for Plaintiff and Respondent.

FILES, P. J.—This is an action for damages for breach of an agreement relating to a private railway crossing. After a court trial judgment was for plaintiff, from which defendant is appealing.

Defendant James Stewart Company (hereinafter called Stewart), a building contractor, was engaged in a construction job on a site adjacent to the plaintiff railway's line in Rose Canyon, north of San Diego. In order that Stewart might have direct access to Highway 101, which was on the opposite side of the tracks, the railway and Stewart entered into a formal agreement, dated November 21, 1956, whereby the railway gave permission to cross its right-of-way and tracks at a specified location. The agreement is on a printed form furnished by the railway. It provides, among other things, that the gates to the crossing will be kept closed and securely fastened except when opened to allow ingress or egress. Stewart also agrees: "4. That it will at all times indemnify and save harmless the Railway Company against all claims, demands, actions, or causes of action, arising or growing out of loss of or damage to property or injury to or death of persons or live stock, resulting in any manner from the construction, maintenance, use, state of repair, or presence of the Crossing upon the Railway Company's premises, or the removal of said Crossing therefrom, and shall promptly pay to the Railway Company the full amount of any loss or damage which the Railway Company may sustain, incur, or become liable for, and all sums which the Railway Company may pay or be compelled to pay in settlement of any claim on account thereof."

In typewriting, this clause is added: "Second Party [Stewart] hereby agrees to provide human flagman at crossing when in use."

On March 22, 1957, at 6:50 a.m., a truck operated by Swan-Wheeler Transportation Company, delivering steel I-beams to the construction site, approached this private crossing from the highway. No flagman was present. The truck driver opened the gate and started across the tracks. A passenger train, northbound from San Diego, struck the vehicle, damaging it

and its cargo and injuring at least one of the railway's passengers.

The injured passenger, Osuna, brought an action in the Superior Court in San Diego County against the railway, its engineer, Swan-Wheeler and its driver. United States Fire Insurance Company (hereinafter U.S. Fire), an insurer which had paid for the loss of the truck and its cargo, brought an action against Stewart, the railway and its engineer, in San Diego. The Osuna and U.S. Fire cases were tried together before the court sitting without a jury.

In Osuna's case, the court found that the negligence of the railway's engineer and fireman "jointly and concurrently with the negligence" of Swan-Wheeler's driver, proximately caused the collision. Judgment was entered against the defendants in the amount of $5,000 plus costs.

In the U.S. Fire case the court found that the railway had operated its train negligently and that the truck driver had contributed to the accident by his own negligence. Judgment was for the defendants in that action.

Subsequently the railway paid Osuna $2,565.57 as its half of the judgment and Swan-Wheeler paid the other half.

On February 1, 1961, the railway brought the present action against Stewart upon the November 21, 1956, contract. After a trial the court found that Stewart had breached the contract by failure to have a human flagman present at the time of the collision, and that this breach was the proximate cause of the collision. The judgment awards the railway damages consisting of the following items:

| | |
|---|---|
| Payment of the Osuna judgment | $2,565.57 |
| Attorney fees and expenses in the Osuna case | 911.07 |
| Expense of repairing railway equipment | 15,134.23 |
| Total | $18,610.87 |

■ Before reaching the principal issue in the case it is necessary to dispose of Stewart's contention that the trial court erred in finding that no flagman was present at the time of the accident. This argument is nothing but a disingenuous attempt to misapply legal doctrine to create a flagman where the record clearly shows there was none.

Both in response to a request for admissions and in the joint pretrial statement of facts, Stewart's attorneys admitted that Clinton McDonald was the only human flagman employed by Stewart on that day, and that he was not at the crossing at the

time of the collision. Nevertheless evidence was received on the subject.

McDonald testified that his regular time for commencing work was 7 a.m., but on this particular day he did not arrive until 7:05.

Stewart called as its witness its own assistant to the president and general counsel, Wallace Tanner, who told of arriving at the scene shortly after the accident and questioning the truck driver. Tanner testified: "And I said, 'Why did you come through the gate when you know that you're not supposed to come through the gate before the flagman's on duty?' and he didn't answer. He did not answer that. And I asked him why he opened the gate and he said he wanted to get through and he just opened the gate."

Stewart now argues that in the U.S. Fire case in San Diego the trial court found as a fact that the flagman was present and that this finding is conclusive against the railway.

The language relied upon in the "findings of fact" in the U.S. Fire case is this: "That it is not true that the James Stewart Company, a corporation, negligently failed and neglected to provide a human flagman and neglected and failed to warn plaintiff's insured or their driver of the damage [sic] of said railroad company [sic]. . . ."

This so-called finding, which in form negatives the exact language of one allegation of the complaint in that action, is really a determination of the legal issue between U.S. Fire and Stewart. This language says only that Stewart did not *negligently* fail. This may be interpreted as reflecting the court's opinion that Stewart owed the trucker no duty to provide a flagman.

It is unnecessary to determine the effect, if any, of a finding in the U.S. Fire case that a flagman was present, because there was no such finding.

The key question in this case is the interpretation and effect of the crossing agreement, as between the parties thereto. Though there is some extrinsic evidence of the circumstances against which the writing must be construed, there is no substantial conflict in that evidence. Upon such a record this court has the duty of reviewing the trial court's interpretation as a question of law. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

It appears that the parties entered into this agreement solely for the benefit of Stewart, and without any considera-

tion to the railway except Stewart's promises to take specified precautions and to indemnify the railway. It also appears from the court's findings, and from the evidence, that this accident would not have occurred had Stewart performed its undertaking to keep the gate ''securely fastened'' and to have a flagman present.

The basic rule for the interpretation of contracts is stated in Civil Code section 1636: ''Contracts, how to be interpreted. A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.''

By this standard only one conclusion is possible here. Considering the text of the writing and the relationship of the parties, no one could doubt that the accident which occurred was exactly the kind of hazard which was contemplated by the parties, and against which the railway was promised protection. Opening any grade crossing inevitably subjects a railway company to an extra hazard of collisions, with the consequences of injury to the railway's own property and exposure to the damage claims of others. The covenants for a secure gate and a flagman were intended to prevent such casualties, and the indemnity clause was intended to shift the financial loss to Stewart if an accident occurred. The indemnification clause is more than a release from liability to Stewart for injury to its property. Stewart promised to pay any loss for which the railway might become liable.

The measure of damages for breach of contract is set forth in Civil Code section 3300: ''For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.''

In *Coughlin* v. *Blair*, 41 Cal.2d 587, 603 [262 P.2d 305], the court said: ''Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract. [Citations.] Damages must be reasonable, however, and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract.''

These rules for measuring damages are to be distin-

guished from rules of interpretation of the contract. (See Rest., Contracts, § 329, com. i.) Given a promise which has created a duty (which the court is able to identify under the rules of construction), and a breach of that duty, the damages must then be measured by the appropriate legal standard.

The damages awarded by the trial court in this action fall easily within the standards cited above.

The detriment resulting from the lack of a flagman was that a collision occurred, wrecking equipment and injuring a passenger. It was readily foreseeable that the injured passenger would sue the carrier and that the court trying that suit would conclude that the railway engineer should not have relied upon Stewart to keep the crossing clear.

Under these principles the cost of repairing the railway's equipment is clearly a recoverable item. But the recovery of the amount which the railway paid its injured passenger raises an additional problem. Although the latter cost was just as clearly a detriment flowing directly from the breach of the promise to provide a flagman, the inclusion of this item in the measure of damages requires an examination of the decisions on the subject of indemnification.

In *County of Alameda* v. *Southern Pac. Co.*, 55 Cal.2d 479 [11 Cal.Rptr. 751, 360 P.2d 327], the railway had constructed a spur track across a county road to serve a rock company. The rock company expressly promised to maintain the track at its own expense. Lack of maintenance at the crossing caused a truck to be wrecked. The trucker obtained a judgment against the county and the railway jointly, based on the breach of their common law duty to maintain the crossing. The county then obtained indemnification against the railway and the rock company. By cross-complaint the railway sought recovery against the rock company, but lost. The Supreme Court said (at p. 487) : ''Southern Pacific therefore argues that it is not an action for indemnification but rather a simple contract action for the damages proximately resulting to it from Rock's breach of the contract to maintain. But the cases in California upon which Southern Pacific relies have treated such an action based upon the violation of a contract duty to the plaintiff by the defendant which resulted in a tort judgment against the plaintiff by a third person as being upon a cause of action on an implied promise to indemnify (*De La Forest* v. *Yandle,* 171 Cal.App.2d 59, 61-62 [340 P.2d 52] ; *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co.*, 162 Cal.App.2d 434,

440, 449 [328 P.2d 785]) and the cases cited and discussed in the latter case (162 Cal.App.2d at pp. 444-448) indicate that courts generally, where they allow such an action, treat it as one for recovery on an implied promise to indemnify the promisee for damages which the promisee is compelled to pay because of the breach by the promisor of his express promise.''

The court then pointed out that the contract between the parties contained no general indemnification clause, but did specifically provide that the rock company would indemnify and hold harmless for (1) injury to the rock company's own property, and (2) injury resulting from the operation of the rock company's own equipment. Since indemnification had been promised expressly with respect to specific matters only, the court reasoned that the contract construed as a whole refuted the inference of any implied promise to indemnify with respect to anything else.

█ Following the reasoning of the Supreme Court in the *Alameda* case, we turn to the indemnification clause in the contract which is before us. Here we find a promise to indemnify against all claims arising out of injury to persons resulting from the use of the crossing, and a promise to pay any damage for which the railway may become liable. We have here Stewart's express promise to pay the amount which the railway had to pay Osuna. There is no need to search for an implied promise to indemnify.

Defendant points out that one of the causes of the collision was the negligence of the railway's engineer and fireman; and defendant refers to the statements which have repeatedly appeared in legal literature that an agreement for indemnification against one's own negligence must be clear and explicit and will be strictly construed against the indemnitee. An analysis of the more recent California decisions will demonstrate that this doctrine is not an obstacle to the enforcement of the contract at bench.

In *Vinnell Co.* v. *Pacific Elec. Ry. Co.*, 52 Cal.2d 411 [340 P.2d 604], the plaintiff, a contractor engaged in building a flood control channel through a railway yard, promised to indemnify the railway against damages resulting from the performance of the plaintiff's work. The railway negligently ran some cars into an excavation made by plaintiff. The plaintiff sued for the injury to its work, and the railway cross-complained for the damage to its cars. The contract was relied

upon by the railway both for exculpation and indemnification. After reviewing the California decisions, the Supreme Court said (at p. 415) : "The rule in this state, as expressed in the cases referred to, is in accord with the weight of authority. 'In the overwhelming majority of the cases the result reached by their interpretational efforts can be condensed into the simple rule that where the parties fail to refer expressly to negligence in their contract such failure evidences the parties' intention not to provide for indemnity for the indemnitee's negligent acts.' (Anno., 175 A.L.R. 8.) "

The court then concluded (at pp. 416-417) : "The indemnification clause in the present case, by not expressly stating that the defendant was protected against acts of its own negligence, failed to meet this requirement."

*Harvey Machine Co.* v. *Hatzel & Buehler, Inc.*, 54 Cal.2d 445 [6 Cal.Rptr. 284, 353 P.2d 924], involved a construction contract in which the contractor agreed to indemnify the owner of the premises against liability for bodily injuries. A workman fell, sustaining injuries as a result of some breach of duty on the part of the owner. The indemnity agreement did not use the word negligence. Nevertheless, considering the relationship of the parties as well as the wording of the agreement, the court held the owner entitled to indemnification. Distinguishing *Vinnell*, the court in *Harvey* pointed to the important factual differences between the two cases. Referring to the language of the *Vinnell* opinion concerning the construction of indemnity contracts, the court said (at p. 449) : "Throughout the opinion, however, it is manifest that it is the intent of the parties which the court seeks to ascertain and make effective. Where, as in the present case, the circumstances of the claimed wrongful conduct dictate that damages resulting therefrom were intended to be dealt with in the agreement, there is no room for construction of the agreement. It speaks for itself."

In *County of Alameda* v. *Southern Pac. Co.*, 55 Cal.2d 479 [11 Cal.Rptr. 751, 360 P.2d 327] (discussed *supra*), the court construed the indemnity agreement adversely to the contentions of the indemnitee, but the opinion contains no suggestion that such an agreement should not be construed by the same standards as any other negotiated contract.

In *Goldman* v. *Ecco-Phoenix Elec. Corp.*, 62 Cal.2d 40 [41 Cal.Rptr. 73, 396 P.2d 377], the parties were the general contractor, Clovis, and a subcontractor, Ecco. Clovis had agreed to indemnify the property owner against all claims, regardless

of responsibility for negligence, and Ecco had agreed to be bound to Clovis " 'in the same manner and to the same extent as Clovis is bound to the Owner under the General Contract, *to the extent of work provided for in this agreement.*' " A man claimed to have been injured due to Clovis' failure to provide a guard rail, and the latter sought indemnification from Ecco. The parties disagreed as to whether the subcontract incorporated the general contract merely to describe the work to be done, or whether the incorporation included the indemnity clause. The Supreme Court expressed its holding in this language (at p. 48) : "We need not, however, determine whether Clovis' or Ecco's interpretation of paragraph 2c is correct. We conclude only that an indemnification agreement calling for financial protection against one's own negligence cannot rest upon language so loose and obscure as that of the instant contract."

From these recent expressions of the Supreme Court we learn this: *Harvey* teaches that the "express negligence" doctrine mentioned in *Vinnell* will not always be applied. The clearly expressed intention of the parties will be enforced.

*Goldman* emphasizes that the agreement must be "clear and express," but creates no artificial obstruction to enforcing the intention of the parties wherever that intention clearly appears. The *Goldman* opinion also points out that a contract to indemnify is not subject to the same public policy objections as is a contract to exculpate the wrongdoers from liability to the injured party. The court said (62 Cal.2d at p. 48) : "Assuming that the agreement provided that Ecco indemnify Clovis from its own negligence, we cannot, however, accept Ecco's contention that such indemnification would violate public policy and therefore fail under the reasoning of *Tunkl* v. *Regents of the University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441], and *Hanna* v. *Lederman* (1963) 223 Cal.App.2d 786, 792 [36 Cal.Rptr. 150]. Clovis does not seek *exculpation* from liability to Butlar but rather *indemnification* from Ecco for such potential liability. The indemnification agreement resembles an insurance agreement; indeed, the real situation here appears to be that Clovis maintains insurance against liability to Butlar and Clovis' insurer now attempts to transfer that liability to Ecco and Ecco's insurer."

For a more recent elaboration of the policy distinction between indemnification and exculpation, see *John E. Branagh &*

*Sons* v. *Witcosky,* 242 Cal.App.2d 835, 837 [51 Cal.Rptr. 844].

Also pertinent is the view expressed by Professor Corbin in the 1964 pocket part to 6A Corbin on Contracts section 1471. Commenting upon the decision of the Texas Supreme Court in *Ohio Oil Co.* v. *Smith* (Tex.) 365 S.W.2d 621, the author of the treatise said: "The Court of Appeals had held, sustaining a strenuous argument by Smith, that since this was a contract to indemnify the owner Ohio against liability for its own negligence, it must be 'strictly interpreted' against the indemnitee (Ohio) and held not to cover cases of liability for its own negligence in the absence of 'express words' including such negligence. The Supreme Court disapproved this argument in both of its aspects: there is no reason to apply the doctrine known as 'strictissimi juris' in the process of determining the intention of the parties; and the intention to include 'negligence' can be, and is in this contract, clearly expressed, even though the word 'negligence' is not used. It is enough that the coverage is clearly expressed in broad all-inclusive language. This treatise is in full accord with the court; and many cases in harmony with it are cited herein . . . . The court says that the 'text authorities are almost unanimous' in supporting the 'Express Negligence Doctrine' (not including this treatise) ; but if such is the case it is due to the fact that they do not distinguish between a contract the sole purpose of which is the exemption of one person from liability for his negligent harm to another, and a contract of 'liability insurance', the chief purpose of which is to transfer to a risk carrier the risk of liability for negligent harm to third persons."

In the case at bench, the railway gave Stewart a favor, and in return Stewart promised to carry the risks. Stewart expressly promised to do an act which would have prevented the loss and it expressly promised to pay for the kinds of losses which were actually sustained. Both promises were breached. The law, common sense, and basic concepts of fair dealing all dictate that Stewart (or its insurance carrier) should pay.

The judgment is affirmed.

Jefferson, J., and Kingsley, J., concurred.

A petition for a rehearing was denied December 30, 1966, and appellant's petition for a hearing by the Supreme Court was denied February 1, 1967.