[No. D015935. Fourth Dist., Div. One. June 1, 1995.]

MARYLAND CASUALTY COMPANY, Cross-complainant and Appellant, v.
BAILEY & SONS, INC., et al., Cross-defendants and Respondents.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and V of the Discussion section.

858

**COUNSEL**

Bronson, Bronson & McKinnon, Ralph S. LaMontagne, Jr., and Eric A. Amador for Cross-complainant and Appellant.

Greco & Traficante, Paul A. Traficante, Scott A. Johnson, Callahan, McCune & Willis, O. Brandt Caudill, Jr., Christopher J. Zopatti, Ault, Deuprey, Jones & Gorman and Alan H. Schonfeld for Cross-defendants and Respondents.

**OPINION**

**HALLER, J.**—This appeal arises from the construction of the Villa Mallorcas condominium project (Project) in the late 1970's. The ensuing construction defect litigation began in 1984 and continued in various forms over the next decade, culminating in this appeal.[2] The remaining parties include appellant Maryland Casualty Company (Maryland), the primary liability insurer for the Project's general contractor and owner (referred to as Kelly), and the respondents, three of the subcontractors on the Project: the masonry subcontractor Bailey & Sons, Inc. (Bailey), the framing subcontractor L&H Construction Company (L&H), and the architect Carl McLarand Associates (CMA) (collectively Subcontractors).

This appeal concerns (1) indemnity claims asserted by Maryland, acting as Kelly's assignee, against each of the Subcontractors, seeking to recover $3.5

[2]The Villa Mallorcas construction defect litigation has been previously before this court, involving a dispute between two of the developer's insurers concerning the excess insurer's action to obtain reimbursement from the primary insurer. (See *Fireman's Fund Ins. Co.* v. *Maryland Casualty Co.* (1994) 21 Cal.App.4th 1586 [26 Cal.Rptr.2d 762]; see *post*, p. 862, fn. 5.)

million paid to the Villa Mallorcas Homeowners Association; (2) breach of contract claims asserted by Maryland, as Kelly's assignee, against Bailey and L&H; and (3) CMA's express indemnity claim asserted against Maryland, as Kelly's assignee, seeking to recover money paid in a settlement to Kelly's excess insurer (Fireman's Fund Insurance Company) plus attorney fees.

The trial court granted the Subcontractors' summary judgment motions as to each of Maryland's claims against them and awarded attorney fees to Bailey and L&H. The court also granted CMA summary judgment on its affirmative indemnity claim against Maryland, awarding CMA $406,004.27.

Maryland appeals, asserting numerous contentions. For the reasons explained below, we affirm the judgment insofar as it holds Maryland is barred from bringing claims against L&H and Bailey for equitable indemnity and for breach of contract to maintain liability insurance. We reverse the remaining portions of the summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1984, the Villa Mallorcas Homeowners Association (Homeowners) brought a construction defect action against Kelly. Kelly cross-complained against several subcontractors, including CMA, Bailey and L&H. These subcontractors in turn filed cross-complaints against Kelly and against each of the other subcontractors. (Kelly's action against the subcontractors will be referred to as the Subcontractor Action).

In July 1987, the trial court severed the Subcontractor Action from the primary action between Homeowners and Kelly. The court thereafter conducted several settlement conferences, during which Homeowners and Kelly presented expert witness testimony and documents. Pursuant to the conferences, Homeowners and Kelly entered into a stipulation of facts, agreeing to permit the court to render a judgment based on the stipulated facts.[3] The stipulated facts identified numerous defects pertaining to the Project and then set forth damage estimates. In a statement of decision, the court found Kelly to be negligent and strictly liable for the construction defects. In December 1987, the court entered a $6,620,000 judgment in favor of Homeowners (hereafter Kelly Judgment). In exchange for Kelly assigning its rights to Homeowners to pursue Kelly's insurers, Homeowners agreed not to execute on the judgment as against Kelly.

---

[3]Although the parties devote much attention in their appellate briefs to the reason the parties entered into this particular form of settlement, the parties' subjective motivations are not relevant to any disputed issue in this appeal.

In February 1988, Maryland filed a declaratory relief action against Homeowners, Kelly, and other insurers for Kelly, including one of Kelly's excess insurers, Fireman's Fund Insurance Company (Fireman's Fund). Maryland sought a declaration of its obligations and requested reimbursement from the other potentially liable insurers.

In October 1990, Maryland and two of Kelly's excess carriers (Northwestern and Fremont) reached a settlement with Homeowners and Kelly (Maryland Settlement). As is relevant here, the agreement provided (1) Maryland agreed to pay Homeowners $3.5 million of the $6,620,000 Kelly Judgment;[4] (2) Kelly assigned "its position as cross-complainant [in the Subcontractor Action] to Maryland, to pursue [the Subcontractors] as Maryland in its sole and exclusive discretion shall decide"; (3) Homeowners (on behalf of Kelly) released Maryland and covenanted it would not seek any further recovery from Maryland on the Kelly Judgment, but would seek any additional recovery on the Kelly Judgment only from Fireman's Fund; and (4) Kelly released all of its claims against Maryland, including bad faith claims.

Shortly after the trial court confirmed the Maryland Settlement as a good faith settlement, Fireman's Fund settled with Homeowners (on behalf of Kelly), agreeing to pay Homeowners $2,453,000 under its excess liability policy.[5]

Maryland thereafter filed an amended complaint adding itself as a cross-complainant (as "assignee of Kelly's position") in the Subcontractor Action.[6] A settlement conference pertaining to the Subcontractor Action was held on January 17, 1991. Counsel for Maryland, L&H, CMA, and Bailey participated at the conference. Although Fireman's Fund was not a named party, Fireman's Fund's counsel also attended the conference.

The settlement conference began with discussions between Maryland's counsel and counsel for the Subcontractors. When it became clear the parties

---

[4]Northwestern and Fremont agreed to pay an additional $450,000 to Homeowners.

[5]In a separate action, Fireman's Fund sued Maryland, seeking reimbursement for Fireman's Fund's payment to Homeowners under theories of equitable subrogation and breach of the covenant of good faith and fair dealing. In a published decision, we affirmed the trial court's dismissal of Fireman's Fund's complaint. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, *supra*, 21 Cal.App.4th 1586.) With respect to the equitable subrogation claim, we concluded Fireman's Fund did not state a cause of action because (1) Kelly had released Maryland *before* Fireman's Fund settled with Homeowners/Kelly, thereby precluding Fireman's Fund from asserting a claim against Maryland on Kelly's behalf; and (2) Fireman's Fund had no obligation to make the settlement payment and was instead a mere "volunteer" based on Fireman's Fund's claim that none of the construction defects occurred during its policy period. (*Id.* at pp. 1595-1598.)

[6]At the time, the only remaining parties were the respondents Bailey, L&H, and CMA. The other named subcontractors had settled with Homeowners.

could not reach agreement, counsel for the Subcontractors asked "if [they] could have discussions with Fireman's Fund Insurance and its counsel . . . ." Maryland's counsel then left. Thereafter, further settlement discussions took place. As a result of these discussions, CMA, L&H and Bailey each conditionally agreed to pay Fireman's Fund $150,000 contingent on a good faith determination.

The Subcontractors moved the court for a good faith determination pursuant to Code of Civil Procedure[7] section 877.6. Maryland opposed the motion. After substantial briefing and a hearing, the court entered an order finding the settlement to be in good faith and further finding "Maryland . . . to be a joint tortfeasor and/or co-obligor." Maryland petitioned for writ of mandate, challenging this ruling. We denied the petition "without prejudice to reviewing the issue on appeal from the judgment."

The trial court thereafter granted Maryland leave to file a third amended cross-complaint. The third amended cross-complaint alleged three types of claims: (1) equitable indemnity claims against each of the Subcontractors; (2) contractual indemnity claims against L&H and Bailey; and (3) breach of contract claims against Bailey and L&H. CMA reasserted its previously filed cross-complaint for express indemnity against Maryland, as Kelly's assignee.

The Subcontractors each moved for summary judgment, contending there were no factual issues and they were entitled to judgment as a matter of law with respect to Maryland's third amended cross-complaint. CMA also filed a summary judgment motion with respect to its cross-complaint against Maryland.

After substantial written briefing and oral argument, the court entered judgment in favor of all three Subcontractors on Maryland's third amended cross-complaint.[8] The court also entered judgment in favor of CMA on its cross-complaint, awarding CMA $406,004.27. The court awarded L&H attorney fees of $130,324 and $11,277.96 in costs and awarded Bailey attorney fees of $512,630.07 and $16,010.61 in costs.

Maryland appeals from these rulings.

---

[7]All statutory references are to the Code of Civil Procedure unless otherwise specified.

[8]The basis for the court's rulings will be set forth in connection with our analysis of the parties' specific contentions.

DISCUSSION

## I. *Introduction Regarding Indemnity Claims*

 Indemnity means "the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].) An indemnitor is the party who is obligated to pay another. An indemnitee is the party who is entitled to receive the payment from the indemnitor.

An indemnity obligation arises from two general sources. First, it may arise from "express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances." (*E.L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 506 [146 Cal.Rptr. 614, 579 P.2d 505].) Courts interpret contractual indemnity provisions under the same rules governing other contracts, with a view to determining the actual intent of the parties. (*Myers Building Industries, Ltd.* v. *Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 968-969 [17 Cal.Rptr.2d 242]; *Ralph M. Parsons Co.* v. *Combustion Equipment Associates, Inc.* (1985) 172 Cal.App.3d 211, 221 [218 Cal.Rptr. 170].)

 Indemnity may also arise based on equitable considerations. (*E.L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d at p. 507.) Unlike contractual indemnity which looks to the parties' intent, equitable indemnification focuses on principles of fairness and justice and "is designed to apportion loss among tortfeasors in proportion to their relative culpability . . . ." (*Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1736 [286 Cal.Rptr. 435].) As will be discussed more fully below, where parties have expressly contracted with respect to the duty to indemnify, the extent of that duty is generally determined from the contract and not by reliance on the independent doctrine of equitable indemnity. (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d at p. 628; *Regional Steel Corp.* v. *Superior Court* (1994) 25 Cal.App.4th 525, 529 [32 Cal.Rptr.2d 417].)

With these general rules in mind, we turn to assess whether the court properly granted summary judgment as to each of Maryland's indemnity claims and as to CMA's indemnity claim. As will be explained, we conclude: (1) the court erred in granting judgment adverse to Maryland on its express indemnity claims against Bailey and L&H because there was insufficient evidence proffered establishing Kelly was actively negligent as a matter of law; (2) the court erred in granting summary judgment in favor of CMA on its express indemnity claim against Maryland because there were

disputed factual issues pertaining to CMA's negligence; (3) the court properly granted judgment adverse to Maryland on its equitable indemnity claims against Bailey and L&H because those claims were precluded by the express indemnity provisions in the parties' contracts; and (4) the court erred in granting summary judgment adverse to Maryland on its equitable indemnity claim against CMA because (a) the parties' express contractual provision did not bar the equitable action (see *E.L. White, Inc.* v. *City of Huntington Beach*, *supra*, 21 Cal.3d 497) and (b) CMA's settlement with Fireman's Fund does not fall within the purview of section 877.6 so as to bar Maryland's equitable action.

## II. *Maryland's Express Indemnity Claims Against Bailey and L&H*

The following indemnity provision was included in Kelly's 1978 subcontracts with L&H and Bailey: "Subcontractor shall indemnify and save [Kelly] harmless against all claims for any damages, including those to persons or to property arising out of Subcontractor's execution of the work covered by this Subcontract whether caused by delay of Subcontractor, defective workmanship or materials or delays caused thereby, . . . ." Based on this indemnity provision, Maryland (as the assignee of Kelly) sought to recover for damages caused by the negligence of L&H and Bailey.

Moving for summary judgment, L&H and Bailey argued they were entitled to summary judgment as a matter of law based on (1) the language of the indemnity provision at issue which they identified as a "Type II indemnity provision[]"; and (2) the Kelly Judgment finding Kelly to be strictly liable. The court granted summary judgment, relying on the rule set forth in *MacDonald & Kruse, Inc.* v. *San Jose Steel Co.* (1972) 29 Cal.App.3d 413, 420 [105 Cal.Rptr. 725] (*MacDonald & Kruse*) that an active tortfeasor may not recover under a Type II indemnity provision and concluding that the prior judgment finding Kelly to be strictly liable was tantamount to active negligence.[9]

Although Maryland admits the contractual provision at issue was a Type II provision and it is bound by the prior finding that Kelly was strictly liable,

---

[9]The court expressly granted L&H's summary judgment motion on these grounds. With respect to Bailey, the court granted summary judgment on Maryland's express indemnity claim based on its finding the claim was barred by the statute of limitations. Because Bailey never moved for summary judgment on the basis that the express indemnity claim was beyond the limitations period (nor is there any arguable basis for asserting such argument) and because Bailey's indemnity provision was identical to that of L&H's, we shall treat the court's order as if it granted summary judgment on Maryland's express indemnity claim against Bailey on the same ground as it granted summary judgment on Maryland's express indemnity claim against L&H.

Maryland argues such facts did not entitle L&H and Bailey to judgment as a matter of law. In evaluating this contention, we first set forth the development of the law applicable to the interpretation of indemnity contracts. We then apply the law to the particular facts of this case as presented at the summary judgment proceedings.

### A. Legal Principles

California courts have developed certain principles of interpretation applicable specifically to indemnity agreements. (See *Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, 1492 [13 Cal.Rptr.2d 624].) One of those long-established principles provides that "[a]n indemnity clause phrased in general terms [e.g., one which does not mention the effect of the indemnitee's negligence] will not be interpreted . . . to provide indemnity for consequences resulting from the indemnitee's own actively negligent acts." (*Markley v. Beagle* (1967) 66 Cal.2d 951, 962 [59 Cal.Rptr. 809, 429 P.2d 129].) The original rationale underlying this rule was that because an agreement for indemnification against one's own negligence is not favored and is an exception to the general rule, an agreement to indemnify an actively negligent indemnitee will not be implied in the absence of express and explicit language. (See *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 257 [85 Cal.Rptr. 178, 466 P.2d 722]; *Goldman v. Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 44 [41 Cal.Rptr. 73, 396 P.2d 377].)

In 1972, an appellate court conducted a comprehensive review of prior California decisions interpreting indemnity agreements. (*MacDonald & Kruse, supra*, 29 Cal.App.3d 413; see 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 99, p. 173.) In so doing, *MacDonald & Kruse* identified three general categories of indemnity agreements ("Type I," "Type II," and "Type III"), and set forth rules governing the interpretation of each "type" of agreement. (*MacDonald & Kruse, supra*, 29 Cal.App.3d at pp. 419-420.) With respect to Type II agreements (the type at issue in the Bailey and L&H subcontracts), the court reiterated the traditional rule that an actively negligent indemnitee may not recover because the contractual provision does not contain an express statement that a negligent tortfeasor may obtain indemnity for its negligence. (*Id.* at p. 419.) The court noted, however, a "passively negligent" tortfeasor is entitled to recover for its "own acts of passive negligence" under a Type II agreement. (*Ibid.*)

In 1975, three years before the subcontracts at issue were executed, our Supreme Court noted that the "active-passive" distinction had been criticized, but "adher[ed]" to the distinction, explaining that it "has long been

accepted by the bench, the bar, and the insurance industry . . . ." (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.*, *supra*, 13 Cal.3d at pp. 632-633.) *Rossmoor Sanitation* made clear, however, that although it was upholding the viability of the active-passive distinction, ". . . the question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts." (*Id.* at p. 633)

Until 1987, California courts generally followed the analysis set forth in *MacDonald & Kruse*, holding that if the parties enter into a Type II indemnity agreement, the agreement precludes recovery by an actively negligent tortfeasor. (See, e.g., *E.L. White Inc.* v. *City of Huntington Beach*, *supra*, 21 Cal.3d at p. 507; *Gonzales* v. *R.J. Novick Const. Co.* (1978) 20 Cal.3d 798, 809-810 [144 Cal.Rptr. 408, 575 P.2d 1190]; *Widson* v. *International Harvester Co.* (1984) 153 Cal.App.3d 45, 59 [200 Cal.Rptr. 136].) However, in 1987 one California appellate court held that an indemnitee *was* entitled to recover "notwithstanding the jury's finding of the indemnitee's 'active' negligence." (*Morton Thiokol, Inc.* v. *Metal Building Alteration Co.* (1987) 193 Cal.App.3d 1025, 1030 [238 Cal.Rptr. 722].) The indemnity agreement at issue in *Morton Thiokol* was essentially identical to the provision contained in the Bailey and L&H subcontracts. Relying on *Rossmoor*'s admonition that "the active-passive rubric ought not to be wholly dispositive," *Morton Thiokol* explained that "[w]here, as here, the agreement clearly indicates that one party was to be indemnified for any damages sustained as a result of another's breach of the contract, and it is undisputed that the accident would never have happened except for such breach, . . . indemnity is viable . . . ." (*Ibid.*) The court stressed that "denying indemnity here would deprive the indemnitee of the benefit of its bargain and read out of the contract essential provisions intended by the parties to govern their relationship." (*Ibid.*)

Drawing on *Rossmoor* and *Morton Thiokol*, this court recently reversed a judgment barring an actively negligent indemnitee from recovering under an indemnity contract silent on the issue of the indemnitee's negligence. (*Hernandez* v. *Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1818-1823 [34 Cal.Rptr.2d 732].) There, a shipyard employee was injured in an accident involving a crane. The employee brought an action against the seller of the crane (Carde Pacific Corporation (Carde)), who then cross-complained against the employer (National Steel and Shipbuilding Company (NASSCO)) on an express indemnity theory. The contract between

NASSCO and Carde provided NASSCO would indemnify Carde against any liability resulting from a crane injury to an employee in any way caused by NASSCO.[10] (*Id.* at p. 1818.) Based on the jury's finding that Carde was negligent, the trial court held Carde was absolutely precluded from recovering on its indemnity claim, stating it was bound to reach such conclusion even though it was "contrary to my sense of fairness . . . ." (28 Cal.App.4th at p. 1819.)

In reversing, we rejected the mechanical application of the rules in *MacDonald & Kruse* and stressed that the enforcement of an indemnity agreement must be "based upon reasonable interpretation of the contract in light of its language, the circumstances of Employee's injury, and the parties' intent . . . ." (28 Cal.App.4th at p. 1822.) We explained: "Reasonably read, . . . the contractual language obligated NASSCO to indemnify Carde for the portion of Carde's liability attributable to NASSCO's fault. Such interpretation is consistent with Carde's reasonable expectation it would be indemnified for liability arising from the negligence of NASSCO. Thus, we conclude despite its 20 percent active negligence Carde was contractually entitled to indemnification from NASSCO for the portion of plaintiffs' joint and several economic damage award attributable to NASSCO's 55 percent negligence that is ultimately paid by Carde." (*Id.* at p. 1822.) We concluded, "although not specifically argued by the parties and not the basis of our decision, . . . the foundation of the holding in *MacDonald & Kruse, Inc.* appears substantially undercut by the subsequently evolving and presumably more equitable trend in statutory and case law toward allocating liability in proportion to comparative fault. [Citations.]" (28 Cal.App.4th at p. 1823.)

B. *Analysis*

Because the indemnity provision here was construed by the trial court without the aid of extrinsic evidence, the interpretation of the clause is a question of law for this court. (*Price* v. *Shell Oil Co., supra,* 2 Cal.3d at p. 256; *Myers Building Industries, Ltd.* v. *Interface Technology, Inc., supra,* 13 Cal.App.4th at p. 974.)

■ Relying on *Rossmoor, Morton Thiokol* and *Hernandez,* Maryland argues a " 'Type II' indemnification provision *now* permits an actively

---

[10]Under the *MacDonald & Kruse* analysis, this type of provision is characterized as a "Type III" because it permits indemnification only where the injury was *caused solely by* the indemnitor. (See *MacDonald & Kruse, supra,* 29 Cal.App.3d at p. 420.) By contrast, a Type II provision permits recovery for concurrent negligence, if the indemnitee was not *actively* negligent. For our purposes, the distinction is not significant because the critical point here is that neither the NASSCO indemnity provision nor the L&H and Bailey indemnity provisions mentioned the effect of the indemnitee's negligence.

negligent party to seek contractual indemnity on a comparative fault basis from the indemnitor." (Original italics.) We do not interpret those decisions so broadly. Each of those courts recognized the general rule that an actively negligent tortfeasor cannot recover under a general indemnity provision, such as here, that is silent on the issue of the indemnitee's negligence. (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d at pp. 631-633; *Hernandez* v. *Badger Construction Equipment Co., supra,* 28 Cal.App.4th at pp. 1822-1823; *Morton Thiokol, Inc.* v. *Metal Building Alteration Co., supra,* 193 Cal.App.3d at p. 1028.) These decisions made clear, however, that the general rule may not always apply and is merely a tool to be used to ascertain the intent of the parties. Our recent refusal to apply *MacDonald & Kruse* in a mechanical manner does not mean we should ignore the traditional rule for interpreting contractual intent if there is a basis in the record to show the parties intended the rule to apply to their contracts.

In determining the parties' contractual intent here, it is significant that Kelly, L&H and Bailey entered into the subcontracts in 1978, more than 17 years ago. At that time, *MacDonald & Kruse* stood as the definitive source clarifying contractual indemnity rights. (See *E.L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d at p. 507.) Three years before the parties executed the subcontracts, our Supreme Court expressly reaffirmed the validity of the active-passive rules applied in Type II indemnity agreements. (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d at p. 633.) Thus, when these contracts were executed, the rule was well settled that an actively negligent party could *not* recover under a contractual provision such as the one before us. On such record, L&H and Bailey established a sufficient basis in their summary judgment motions to trigger the traditional rule.

Accordingly, the burden shifted to Maryland to proffer facts in opposition to the summary judgment motion, showing why the general rule should not apply, e.g., that the parties specifically intended that Kelly could recover notwithstanding its active negligence. Maryland failed to present any *evidence* that the parties intended anything other than to apply general rules which were in effect at the time Kelly entered into the contracts. Thus, on the record before it, the trial court properly interpreted the indemnity provisions to mean that Maryland is precluded from recovering on its express indemnity claims against L&H and Bailey if Kelly was "actively negligent" in causing the defects.

■ We next turn to the issue whether L&H and Bailey proffered sufficient evidence establishing as a matter of law that Kelly was, in fact, actively negligent. In attempting to establish Kelly's active negligence, L&H and

Bailey relied *exclusively* on the Kelly Judgment, finding Kelly to be " 'strictly liable for the [construction] defects . . . .' "[11] L&H and Bailey argued strict liability was equivalent to "active negligence." The court agreed and granted summary judgment. Maryland contends the court's ruling was error.

In determining whether a party was actively negligent, the essential inquiry is whether the party participated " 'in the conduct or omission which caused the injury beyond the mere failure to perform a duty imposed upon him by law.' [Citation.]." (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra*, 13 Cal.3d at p. 629.) Generally, the issue is a question of fact. Active negligence may be determined as a matter of law only "when the evidence is so clear and undisputed that reasonable persons could not disagree." (*Ibid.*)

A residential real estate developer is strictly liable for any defect in the final product, regardless whether the developer had any involvement in the conduct causing the defect. (See *La Jolla Village Homeowners' Assn.* v. *Superior Court* (1989) 212 Cal.App.3d 1131 [261 Cal.Rptr. 146].) Thus, whether the developer actively participated in creating a defect or acted with nonfeasance, the developer is strictly liable to the purchaser of the residence.

On the summary judgment record before us, it is undisputed that Maryland is bound by the Kelly Judgment, finding Kelly strictly liable and negligent. However, the record does not contain undisputed facts from which one can determine whether Kelly was actively negligent or merely passively negligent in developing the Project.

L&H and Bailey urge that this factual determination is not significant here because a finding of strict liability is the legal equivalent of "active negligence." In support of this position, they rely on a line of cases holding strict *products* liability is a form of "active negligence" for purposes of interpreting an indemnity agreement. (*Price* v. *Shell Oil Co., supra*, 2 Cal.3d 245; accord, *Widson* v. *International Harvester Co., supra*, 153 Cal.App.3d 845; *Dart Transportation Service* v. *Mack Trucks, Inc.* (1970) 9 Cal.App.3d 837 [88 Cal.Rptr. 670].)

---

[11]During oral argument, Bailey's attorney asserted that Bailey additionally proffered specific facts showing Kelly was actively negligent in directing Bailey employees on the manner in which they should perform their masonry tasks. However, Bailey did not refer to such evidence in its summary judgment papers, including its memorandum of points and authorities and its separate statement of undisputed facts. To the extent that the evidence may have been before the court on another proceeding, the evidence cannot be relied on here. Evidence that was not before a court in granting a summary judgment motion cannot be used to later justify a summary judgment. (See *North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31 [21 Cal.Rptr.2d 104] [" ' "This is the Golden Rule of Summary Adjudication: if [a fact] is not set forth in the separate statement, *it does not exist*." ' " (original italics)].)

In *Price*, Shell Oil Company (Shell) installed a defective ladder on a gasoline tank truck and leased the truck to Flying Tiger Lines. (*Price* v. *Shell Oil Co.*, *supra*, 2 Cal.3d at p. 248.) An employee of Flying Tiger Lines was injured and prevailed against Shell on strict liability grounds. Shell sought indemnity from Flying Tiger. Construing a general indemnity provision similar to the one here, *Price* concluded the contractual language did not permit Flying Tiger to be held responsible for Shell's acts. (*Id.* at pp. 257-258.) Emphasizing that the strict liability doctrine is designed to protect the user or consumer of a product, *Price* stated that a contrary conclusion would "do violence to the doctrine of strict liability and thwart its basic purpose." (*Id.* at p. 258.)

Relying on *Price*, in *Widson* we held a manufacturer of a defective earth moving machine, which had been found passively negligent and strictly liable, could not obtain indemnity from the lessee/user of the product (the employer of a worker injured by the machine) based on a Type II indemnity provision. (*Widson* v. *International Harvestor Co.*, *supra*, 153 Cal.App.3d at p. 60.) We stressed that if the *user* of the product "is to be held responsible for the liability to . . . [the] party found guilty of furnishing a defective product, the language imposing such a liability must do so expressly . . . so that the contracting parties are advised of the terms and the liability to which they are exposed." (*Ibid.*) We rested our conclusion primarily on public policy grounds explaining: "it would thwart basic public policy behind strict liability to permit indemnification of a strictly liable defendant under a general indemnity clause. . . ." (*Ibid.*)

L&H and Bailey urge us to extend the *Price-Widson* line of cases beyond the *products* liability area to preclude a strictly liable general contractor from recovering against a subcontractor under a general indemnity agreement. We decline to do so.

*Price* and *Widson* involved circumstances where the strictly liable party who put the defective product into the stream of commerce was seeking indemnity from *the consumer of the product.* To allow indemnification under such circumstances would permit the party placing the defective product into the stream of commerce to abrogate by contract its liability to the consumer —*the party within the class the strict liability doctrine was specifically intended to protect.* (*Price* v. *Shell Oil Co.*, *supra*, 2 Cal.3d at p. 258; *Widson* v. *International Harvestor Co.*, *supra*, 153 Cal.App.3d at pp. 60-61; *Dart Transportation Service* v. *Mack Trucks, Inc.*, *supra*, 9 Cal.App.3d at p. 849.) To avoid this anomaly, *Price* and *Widson* equated strict liability with active negligence.

Because *Price* and *Widson* are product liability cases which analyze the effect of strict liability on contractual indemnity rights, at first blush it seems

only logical to apply their holdings here and to conclude that strict liability equates to active negligence. The fact that the application of strict liability concepts to developers of mass produced homes derives from product liability cases, serves to underscore the reasonableness of resolving the issues as the trial court did.

But to do so would ignore a fundamentally important distinction that makes the policy considerations underlying *Price* and *Widson* inapplicable here. Unlike the facts in *Price* and *Widson*, Maryland does not seek indemnity from a "consumer" of the product. Rather, it seeks indemnity from a party (the subcontractor) who played an integral part in the *creation* of the "product." Because the Subcontractors here were involved exclusively in the production, rather than the use, of the final product (the condominiums), permitting a contractor to seek indemnification from the culpable subcontractor is in no way inconsistent with *Price* and *Widson*. Instead, allowing indemnification will further another important policy consideration: the sharing of fault among those whose conduct caused the construction defect. Indeed, we recently recognized the basic principle that general contractors should be permitted to spread the cost of strict liability to culpable subcontractors. (See *La Jolla Village Homeowners' Assn.* v. *Superior Court, supra,* 212 Cal.App.3d 1131.) Accordingly, we determine the court erred in finding Kelly was actively negligent based only on the prior strict liability finding.

### C. Conclusion On Maryland's Express Indemnity Claims

We conclude on the record before us that the L&H and Bailey indemnity provisions preclude recovery for Kelly's active negligence. We further conclude L&H and Bailey failed to present sufficient evidence establishing Kelly was actively negligent. Accordingly, the court erred in granting judgment on Maryland's express indemnity claims against Bailey and L&H.[12] (See *United Community Church* v. *Garcin* (1991) 231 Cal.App.3d 327, 338 [282 Cal.Rptr. 368] [until the moving party plaintiff demonstrates a prima facie right to recover as a matter of law, "the defendant has no burden to produce opposing evidence or to disprove anything at all"].)

### III. CMA's Express Indemnity Claim Against Maryland*

. . . . . . . . . . . . . . . . . . . . . . . . .

### IV. Maryland's Equitable Indemnity Claims

The court granted the Subcontractors' summary judgment motions on Maryland's equitable indemnity claims based on the court's determination

---

[12]Our conclusion should not be interpreted as an expression of opinion as to whether a trier of fact will ultimately determine Maryland was or was not actively negligent.

*See footnote 1, *ante*, at page 856.

that section 877.6 barred the claims because of the Subcontractors' good faith settlement with Fireman's Fund.

As explained below, we agree summary judgment was appropriate with respect to Maryland's equitable indemnity claims against Bailey and L&H. We reach this conclusion, however, not on the basis of section 877.6, but instead based on our determination Maryland's claims are barred by the express indemnity provisions in the parties' contracts. With respect to CMA, we conclude the court erred in granting summary judgment on Maryland's equitable indemnity claim because (1) CMA's express indemnity provision does not preclude Maryland's equitable indemnity claim; and (2) the CMA/Fireman's Fund settlement does not fall within the purview of section 877.6.

A. *Effect of Express Indemnity Provisions*[20]

■ Where parties expressly contract with respect to the duty to indemnify, " 'the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity.' " (*Regional Steel Corp.* v. *Superior Court, supra,* 25 Cal.App.4th at p. 529, quoting *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d at p. 628; accord, *Markley* v. *Beagle, supra,* 66 Cal.2d at p. 971; *Peter Culley & Associates* v. *Superior Court, supra,* 10 Cal.App.4th at p. 1492.) This rule seeks to "permit[] people to voluntarily order their affairs in a manner agreeable to them" and recognizes that "equity rarely interferes with a contract knowledgeably executed." (*C.L. Peck Contractors* v. *Superior Court* (1984) 159 Cal.App.3d 828, 834 [205 Cal.Rptr. 754].)

Applying these principles, we recently held a general contractor was precluded from bringing an equitable indemnity claim against a subcontractor because the subcontract contained an express indemnity clause requiring the subcontractor to indemnify the contractor where the loss or damage was " 'caused in whole' " by the subcontractor. (*Regional Steel Corp.* v. *Superior Court, supra,* 25 Cal.App.4th at p. 529.) We explained "[b]y contract, [the contractor] bargained away its right to pursue [the subcontractor] on equitable indemnity grounds. Because [the subcontractor's] duty is limited by contract and [the contractor] did not sue on the contract, [the subcontractor] was entitled to summary judgment." (*Ibid.*)

---

[20]The parties did not address the issue of the effect of the parties' express indemnity provisions on Maryland's equitable indemnity claims in the summary judgment proceedings or in their initial appellate briefs. Pursuant to our request, each party filed a supplemental letter brief addressing this issue.

### 1. *Bailey and L&H Subcontracts*

As described above, the express indemnity provisions in the Bailey and L&H subcontracts required Bailey and L&H to indemnify Kelly under certain circumstances, including where the damage was not caused by Kelly's active negligence. Thus, as in *Regional Steel*, the parties specifically agreed to a more limited form of indemnity than is provided by the equitable indemnity doctrine. Under such circumstances, the express indemnity provisions contained in the Bailey and L&H contracts barred an equitable indemnity action. (See *Regional Steel Corp.* v. *Superior Court, supra*, 25 Cal.App.4th at p. 529.)

Thus, the court properly granted summary judgment as to Maryland's equitable indemnity claims against Bailey and L&H. The fact the court did not grant the summary judgment based on the existence of the parties' express contractual provisions does not affect our determination. (See *California Aviation, Inc.* v. *Leeds* (1991) 233 Cal.App.3d 724, 731 [284 Cal.Rptr. 687] ["[w]e review [the trial court's] ruling, not its rationale"].)

### 2. *CMA Subcontract*

The CMA/Kelly indemnity provision was different from the Bailey and L&H provisions in a significant respect. Whereas the Bailey and L&H contracts specifically set forth the circumstances under which *Kelly* was entitled to seek indemnification *from the subcontractors*, the CMA contract set forth the circumstances under which the *subcontractor* (CMA) was entitled to seek indemnification *from Kelly*. Unlike the Bailey and L&H contracts, the CMA contract was silent as to whether Kelly was entitled to obtain indemnification from the subcontractor. Our Supreme Court has held that in such circumstances, equitable indemnity "may indeed come into play" because "the duty established by contract is by the terms and conditions of its creation inapplicable to the particular factual setting . . . ." (*E.L. White, Inc.* v. *City of Huntington Beach, supra*, 21 Cal.3d at p. 508.)

In *E.L. White*, there were several lawsuits arising from a construction site accident. In the first lawsuit, the injured plaintiffs recovered a judgment as against White (the general contractor) and the City (the owner of the project). (*E.L. White, Inc.* v. *City of Huntington Beach, supra*, 21 Cal.3d at p. 503.) In the second lawsuit, the city filed a declaratory action against White, seeking to establish its right to recover based on an express indemnity provision providing White was obligated to indemnify the city unless the

city was actively negligent. A judgment resulted in White's favor based on a finding the city had been actively negligent in supervising the construction. (*Ibid.*)

The *E.L. White* decision arose from the judgment in the third lawsuit. In that lawsuit, the parties' positions were reversed. White sued the city, seeking *equitable* indemnity. The trial court sustained the city's demurrer. On appeal, the city argued White failed to state a cause of action because the indemnification provision between the parties "memorialized the entire agreement between them . . . and by excluding from their agreement any language indicating a right of indemnity in White against City, they indicated their intention that no such right should exist or be implied under any circumstances in favor of White." (*E.L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d at p. 506.) *E.L. White* expressly rejected this contention, explaining: "It has been finally determined . . . that the contractual provision herein involved was not intended to and did not create an obligation in . . . White to hold the . . . City harmless from liability resulting in whole or in part from the latter's active negligence. It has also been determined in that action that City was actively negligent . . . . *These two determinations . . . necessarily lead to the conclusion that the scope of the express indemnity clause agreed to by the parties did not extend to the circumstances which subsequently arose and led to liability.* This being so, any preemptive effect . . . which the clause might have had in circumstances not involving active negligence on City's part did not extend to the instant situation. *Accordingly, the principles of implied equitable indemnity must be held to have come into play.*" (*E.L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d at p. 510, italics added.)

With respect to the CMA subcontract, the factual situation here is indistinguishable from *E.L. White.* Both the CMA indemnity provision and the provision involved in *E.L. White* referenced a "one way" indemnity obligation in favor of the contractual indemnitee and against the contractual indemnitor. Additionally, as in *E.L. White,* the contractual indemnitor sought equitable indemnity from the contractual indemnitee. Under such circumstances, the Supreme Court held equitable indemnity "come[s] into play," absent an expressed intent to the contrary.

Pursuant to our request, CMA submitted a supplemental brief on the issue of whether its express indemnity provision bars Maryland's equitable action. CMA, however, failed to offer any basis upon which *E.L. White* can be distinguished from the instant situation. We have found none. Accordingly, we conclude Maryland had a valid cause of action for equitable indemnity as against CMA.

B. *Effect of the Fireman's Fund/CMA Settlement*

■ We next address the issue whether Maryland's equitable indemnity claim was barred by CMA's settlement with Fireman's Fund, pursuant to section 877.6.[21]

Section 877.6 provides a good faith settlement between a "plaintiff or other claimant" and a "joint tortfeasor or co-obligor" bars "any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity . . . ." (§ 877.6, subd. (c).) The code section "provides a means for *some* settling litigants to insulate themselves from contribution [and equitable indemnity] claims." (*Herrick Corp.* v. *Canadian Ins. Co.* (1994) 29 Cal.App.4th 753, 758 [34 Cal.Rptr.2d 844], italics in original; see also *Hartford Accident & Indemnity Co.* v. *Superior Court* (1994) 29 Cal.App.4th 435, 439 [34 Cal.Rptr.2d 520].)

By its terms, section 877.6 governs only those settlements between a "plaintiff or claimant" and a "joint-tortfeasor or co-obligor."[22] CMA argues its good faith settlement with Fireman's Fund falls within section 877.6 because (1) *Fireman's Fund* was a "*claimant*" by retaining a potential indemnity claim (as Kelly's subrogee) against CMA for the amounts Fireman's Fund paid to Homeowners; and (2) *CMA* was a "*joint-tortfeasor*" with Maryland since both it and Maryland (Kelly) owed duties to the Homeowners.

While CMA's analysis may be correct when one views each element in isolation, an examination of the settlement as a whole makes clear that section 877.6 is inapplicable under the circumstances. Most significantly, CMA and Maryland are joint tortfeasors only in the sense that Maryland stands in the shoes of Kelly; similarly, Fireman's Fund is a claimant only in the sense that Fireman's Fund stands in the shoes of Kelly. CMA thus seeks to wholly defeat *Kelly*'s (Maryland's) rights by settling with *Kelly* (Fireman's Fund). Viewed from this perspective, the settlement cannot, in any

---

[21]Section 877.6 provides in relevant part: "(a)(1) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors or co-obligors on a contract debt shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors or co-obligors, . . . .·

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."

[22]Since the co-obligor term applies only to contracts entered into after 1988 (see *Hartford Accident Indemnity Co.* v. *Superior Court, supra,* 29 Cal.App.4th at p. 440, fn. 4), it has no relevance in this case.

sense of the phrase, be construed as a "good faith settlement" under section 877.6.

Under the typical situation triggering section 877.6, the injured party settles with one of the parties alleged to have caused its damage. If the settlement is confirmed to be in good faith, other joint tortfeasors (parties who the injured party also alleges to have caused its damage) are barred from bringing equitable indemnity or contribution actions against the settling tortfeasor. This result achieves the primary objectives of section 877.6: promoting the "equitable sharing of costs among the parties at fault and the encouragement of settlements." (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 871-872 [239 Cal.Rptr. 626, 741 P.2d 124].)

These objectives would not be satisfied if we held the Fireman's Fund/ CMA settlement bars claims by Maryland. Relative to CMA, Fireman's Fund and Maryland are essentially the same party. There is no legitimate policy reason for encouraging CMA to settle with "Kelly," (Fireman's Fund) in order to cut off "Kelly's" (Maryland's) rights. Defeating the rights of one of those parties will merely result in additional litigation as those parties attempt to determine their rights vis-à-vis each other. Moreover, the result in this case does not promote equitable cost sharing since it permits the parties to unilaterally decide that Fireman's Fund should obtain a recovery on its claim, whereas Maryland, *which also is a "claimant" in the sense that it is seeking to affirmatively recover against CMA*, is entitled to nothing. Section 877.6 was not intended to be used as a vehicle to resolve competing claims between two subrogees or assignees of the same party.

Section 877.6 is inapplicable to the Fireman's Fund-CMA settlement for another reason—Fireman's Fund was not a "claimant" because Fireman's Fund never had any "claim" to assert. In January 1991, Kelly assigned all of its rights against the Subcontractors to Maryland. Fireman's Fund *then* settled with the Homeowners, agreeing to pay $2,453,000 under Kelly's 1984-1985 liability policy. Thus, at the time Fireman's Fund settled with the Homeowners on behalf of Kelly, Kelly had no rights as against the Subcontractors. Because an insurer has no greater rights against a third party than did the insured at the time the payment was made (see *Fireman's Fund Ins. Co.* v. *Maryland Casualty Co., supra*, 21 Cal.App.4th at p. 1596; *Allstate Ins. Co.* v. *County of Alameda* (1973) 33 Cal.App.3d 418, 421 [109 Cal.Rptr. 53]), Fireman's Fund obtained no rights as against the Subcontractors.[23]

Further, as we noted in *Fireman's Fund,* to the extent Fireman's Fund paid any money to the Homeowners, it did so as a "volunteer" since there was no

---

[23]CMA relies on a subrogation provision in Kelly's insurance contract with Fireman's Fund providing "in the event of any payment under this policy . . . [Kelly] shall do nothing after loss to prejudice such [subrogation] rights . . . ." As we recently observed, however, the

factual basis for finding Fireman's Fund owed a duty to Homeowners (on behalf of Kelly) because the alleged defects did not occur during Fireman's Fund's policy period (1984-1985). (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 21 Cal.App.4th at pp. 1597-1598.)

Under the circumstances here, section 877.6 does not bar Maryland's action against CMA because of CMA's settlement with Fireman's Fund.[24] Accordingly, the court erred in determining section 877.6 barred Maryland from asserting its equitable indemnity claim as against CMA. Accordingly, the court improperly granted summary adjudication in favor of CMA arising from Maryland's claims for equitable indemnity.

### V. *Maryland's Breach of Contract Claim Against Bailey**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### CONCLUSION

In its third amended cross-complaint, Maryland alleges nine identical causes of action against L&H and Bailey. The first cause of action alleges (1) a claim for express indemnity and (2) a claim for the breach of an agreement to maintain insurance. The fifth cause of action seeks declaratory relief. The remaining causes of action, in substance, are claims for equitable indemnity. For the reasons expressed above, we affirm the judgment in favor of Bailey and L&H as to all of Maryland's equitable indemnity causes of action and as to the first cause of action to the extent it alleges L&H and Bailey breached their agreements to maintain liability insurance. We reverse the judgment adverse to Maryland on its first and fifth causes of action for express indemnity as against L&H and Bailey.

In its third amended cross-complaint, Maryland alleges five causes of action against CMA. These causes of action are, in substance, equitable

existence of such subrogation provision does not invalidate the prior release; instead at most the provision "might provide an insurer grounds to deny payment of a claim." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 21 Cal.App.4th at p. 1597, fn. 10.)

[24] We need not reach Maryland's alternative contention that section 877.6 is inapplicable because it governs only when the original injured party plaintiff is a participant in the settlement agreement. (See *Arizona Pipeline Co. v. Superior Court* (1994) 22 Cal.App.4th 33, 42 [27 Cal.Rptr.2d 118] [holding the phrase " 'plaintiff or other claimant' " means "the injured party claimant," and does not include joint tortfeasors seeking indemnity from other joint-tortfeasors].) We note only that *Arizona Pipeline* arose in a different factual setting from the present case, wherein the court emphasized that some of the injured party plaintiffs had pending claims against the tortfeasors when the tortfeasors entered into the "defendant only" settlement. By contrast, here the Homeowners had no remaining claims to assert.

*See footnote 1, *ante,* at page 856.

indemnity claims. For the reasons expressed above, we conclude the court erred in granting summary judgment in favor of CMA on Maryland's equitable indemnity claims and reverse the judgment.

In its cross-complaint against Maryland, CMA alleges an express indemnity claim. For the reasons expressed above, we conclude the court erred in granting summary judgment in favor of CMA on the express indemnity claim and reverse.

### DISPOSITION

Judgment reversed in part and affirmed in part. The matter is remanded for proceedings consistent with this opinion. Each party to bear its own costs on appeal.

Froehlich, Acting P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 14, 1995.