[Civ. No. 31768.   Second Dist., Div. Four.   July 18, 1968.]

CLARK C. AKIN, Plaintiff and Respondent, v. BUSINESS TITLE CORPORATION, Defendant and Appellant.

----

*Assigned by the Chairman of the Judicial Council.

154

Mack, Nast & Boss and Leo Mack, Jr., for Defendant and Appellant.

Christopher Hall for Plaintiff and Respondent.

KINGSLEY, J.—Plaintiff, Clark C. Akin, was the seller of a bar and restaurant business located in Orange County. Defendant, Business Title Corporation, an escrow company, acted as escrow holder in connection with the sale. As a part of the purchase price, plaintiff received a note secured by a chattel mortgage on personal property in the bar and restaurant, which property was worth about $7,500. Defendant corporation undertook the recordation of the chattel mortgage and defendant sent the mortgage of chattels to California Land Title Corporation, with whom it had done business for years, for recordation of the mortgage.. California Land Title Corporation erroneously recorded the mortgage in Los

Angeles County instead of Orange County where the property was located.

The buyer went bankrupt and plaintiff's mortgage was invalid because of erroneous recording. Plaintiff sued and recovered judgment against defendant escrow company for the value of the chattel mortgage plus 7 percent interest. The escrow agreement contained an exculpatory clause which it is contended was intended to insulate the escrow company from its own ordinary negligence. Defendant appeals.

The primary issue presented on this appeal is whether the exculpatory clause[1] is valid so that defendant would not be liable for its own negligence.

Defendant, Business Title Corporation, relies on the case of *Simmons* v. *Bank of America* (1958) 159 Cal.App.2d 566 [323 P.2d 1043].[2] In the *Simmons* case the defendant bank, the escrow agent, failed to record plaintiff's chattel mortgage and plaintiff sued when the buyer went bankrupt. The escrow agreement contained an exculpatory clause similar to the one in the present case. The court upheld the validity of the exculpatory clause, stating that contracts relieving individuals from their own ordinary negligence do not contravene public policy.

Plaintiff Akin relies on the more recent Supreme Court case of *Tunkl* v. *Regents of the University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].[3] In *Tunkl* a patient was required to sign an exculpatory agreement, relieving UCLA Medical Center from any type of negligence except certain specific types, before he would be treated

---

[1]The exculpatory clause reads:

"It is understood by the parties hereto that in consideration of Business Title Corporation acting as an escrow holder, that it shall in no case or event be liable for the failure of any of the conditions of this escrow, or damage caused by the exercise of its discretion in any particular manner, or for any other reason, except gross negligence or wilfull [sic] misconduct with reference to said escrow, and it shall not be liable or responsible for its failure to ascertain the terms or conditions, or to comply with any of the provisions of any agreement contract, or other document or written instrument filed herein, or referred to in the escrow, nor shall it be liable or responsible for or on account of any fraud of any nature whatsoever, for forgeries of any nature whatsoever, or for false personations."

[2]*Simmons* v. *Bank of America* is discussed briefly in Hastings Law Journal. (James B. Smith, *Contractual Controls of Damages in Commercial Transactions* (Nov. 1960) 12 Hastings L.J. 122, 151.)

[3]Certain dangers inherent in the *Tunkl* opinion are set forth in an article entitled *Torts: Malpractice: Hospital's Exculpatory Release from Liability for Future Negligence Held Invalid* (May 1964) 11 U.C.L.A. L.Rev. 639.

at the hospital. The Supreme Court held the exculpatory clause invalid as against public policy on the ground that the exculpatory clause in the contract was affected with a public interest. The *Tunkl* court stated that a contractual provision attempting to absolve a party from liability for negligence will be held invalid as affecting the public interest if it involves a transaction which exhibits some or all of the following characteristics:

"It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." [References to footnotes, and footnotes omitted.] (*Tunkl* v. *Regents of the University of California* (1963) 60 Cal.2d 92, 98-101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)

In comparing these six criteria set forth in *Tunkl* to the case at bench we find that the transaction before us is also one that "affects the public interest." The transaction concerns a business of the type generally thought suitable for public regulation, and escrow companies have in fact been regulated to some degree by licensing requirements. (Fin. Code, § 17200 et seq.) "[T]he nature of the regulation imposed on a business may still afford a clue as to whether exculpation will be permitted. Regulations creating a duty to serve the public or imposing safety or professional standards for a business indicate public concern, extending beyond the specific regulations, for maintaining a standard of service which exculpation would tend to undermine." (Daniel I. Reith, *Contractual Exculpation from Tort Liability in Cali-*

*fornia—The "True Rule" Steps Forward* (1964) 52 Cal.L. Rev. 350, 352.) Since Financial Code sections 17200 et seq. set safety standards for escrow businesses, the escrow business is apparently thought to be a business suitable for public concern, satisfying this aspect of the *Tunkl* test.

Continuing our examination of the other standards set forth in *Tunkl*, we also find that the escrow company performs an important public service. Although it is possible for a party involved in a real estate transaction to get another escrow agent, or to not use the standard escrow procedure, it is often a matter of "practical necessity" for some members of the public to use the designated escrow agent. This is particularly true in cases such as the one at bench where the detailed provisions of the bulk sales law were involved. The escrow company holds itself out as willing to perform its service for any member of the public who seeks the service, or at least for any member coming within certain established standards. The escrow company possesses a decisive advantage of bargaining strength against a member of the public who seeks its services. Bargaining power need not be a monopoly, and "the power may simply be the result of a 'monopoly' in judgment, brains and foresight as where one party prepares the contract from which the other signs without considering the possible consequences." (Daniel I. Reith, *Contractual Exculpation from Tort Liability in California—The "True Rule" Steps Forward* (1964) 52 Cal.L.Rev. 350; 354.) The escrow business also presents to the public a "standardized adhesion contract of exculpation."[4] Additionally, there appears to have been no provision for paying an additional reasonable fee to the escrow company to obtain additional protection against negligence. And, finally, as a result of the transaction, the parties to the transaction are placed under the control of the escrow company and subject to the risk of its carelessness.

Apart from *Simmons* v. *Bank of America, supra,* (1958) 159 Cal.App.2d 566, which as we have indicated we regard as

[4]The name "contract of adhesion" indicates that the legal transaction is not formulated as a result of the give and take of bargaining where the desires of one party are balanced to those of the other. The customer, by entering the transaction, has to adhere to the terms prescribed by the enterprise and only a very few terms may be open to his determination. (Arthur Lenhoff, *Contracts of Adhesion and the Freedom of Contract: A Comparative Study in the Light of American and Foreign Law* (April 1962) 36 Tulane L.Rev. 481.)

no longer controlling, neither the briefs nor our own research have disclosed any cases that are directly in point.

Defendant cites to us the decision in *Delta Air Lines, Inc.* v. *Douglas Aircraft Co., Inc.* (1965) 238 Cal.App.2d 95 [47 Cal.Rptr. 518], decided by this court. We regard our holding there as entirely consistent with our view that defendant escrow company is liable to plaintiff in spite of the attempt at exculpation. In *Delta* we found that the elements of an adhesion contract were absent where a major airline, with the aid of an experienced staff of attorneys and executives, negotiated a contract to purchase an aircraft, where there was no inequality of bargaining power, and the public interest was not affected. But the individual seller of property, in the case before us, in dealing with the escrow company, is not comparable to Delta Air Lines dealing with Douglas. The individual seller of property does not have the economic power or legal and executive assistance that Delta had, nor was the general public interest affected by the transaction in *Delta* as the general public interest is affected here. "It is certain that with the increasing size of business enterprises, their pervasive effect on all aspects of life, and the close association between business and government, there is an increasing tendency to view enterprises which in the past were looked on as merely private as today having a public character." (Richard Waltham, *Contractual Exemption from Liability for Negligence in Alabama* (1965) 17 Ala.L.Rev. 283, 295.) Escrow companies, at least in the State of California, have such a pervasive effect on the economic life of our citizens that they have to some degree taken on a public character.

In *Grisinger* v. *Golden State Bank* (1928) 92 Cal.App. 443, [268 P. 425], and in *Hiroshima* v. *Bank of Italy* (1926) 78 Cal.App. 362 [248 P. 947], banks that had paid checks in violation of "stop orders" were held liable to the makers in spite of broadly drawn exculpatory provisions contained in the stop orders themselves.[5] The factors of public interest and inequality of bargaining power are at least as prominent in the case of an escrow holder as in the case of a bank.

██    While the general rule still is that an exculpatory

---

[5] The New York rule apparently is contra. See *Rosenbaum* v. *First Nat. City Bank* (1961) 13 App.Div.2d 100 [213 N.Y.S.2d 513]; and see, also, 1 A.L.R.2d 1155.

In *Ciofalo* v. *Vic Tanney Gyms, Inc.* (1961) 10 N.Y.2d 294 [177 N.E.2d 925], where the validity of an exculpatory clause was upheld, there was no public service involved of the character with which we are here concerned.

clause relieving individuals of liability for their own ordinary negligence does not contravene public policy (*Werner* v. *Knoll* (1948) 89 Cal.App.2d 474 [201 P.2d 45]), a "contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a 'take it or leave it' basis carries some consequences that extend beyond orthodox implications." (*Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 105, 419 P.2d 168].) Where the public interest is affected the exculpatory clause will be held invalid. (See *Tunkl* v. *Regents of the University of California, supra* (1963) 60 Cal.2d 92.) ▮▮▮ We hold that the exculpatory clause before us cannot relieve the escrow company from liability.

"[T]oday freedom of contract does not commend itself to us as a social ideal in quite the same way. In the more complicated social conditions of our industrialized society it wins approval only to the extent that there is reasonable equality of bargaining power between the parties and no injury is done to the economic interests of the community at large. The moral principle that persons should abide by their agreements is today met by the equally cogent principle that one should not take advantage of an unfair contract which one has persuaded another to enter into under economic or social pressure . . . ." (Justice C. H. Bright [quotation is an excerpt from a statement by Phillip Jeffry], *Controls of Adhesion and Exemption Clauses* (November 1967) 41 Aust.L.J. 261, 266.)

Plaintiff also argues that the exculpatory clause is not applicable to the breach of duty in question, on the grounds that the exculpatory clause was not renewed in specific connection with possible negligent recordation of documents. Since we have decided that the exculpatory clause is invalid we need not decide this latter question.[6]

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

---

[6]Defendant, Business Title Corporation, raises no issue of fact that the error in recording was actually made by California Land Title Corporation.