Opinion
 

 PARRILLI, J.
 

 In this case we must determine whether a hold harmless agreement absolved North American Title Company (North American) of liability for negligence when North American failed to record a deed of trust in a timely fashion. We conclude the trial court correctly found the hold harmless agreement protected North American. Consequently, we affirm the defense judgment as to North American. However, we also conclude the trial court erred in calculating the amount of damages plaintiff is entitled to recover from another defendant. Consequently, we modify the judgment to permit plaintiff to recover the correct amount of damages ($515,000).
 

 I
 

 Facts
 

 This case arises out of a series of real estate transactions between appellant William B. Rooz and David Kimmel. In late 1989, Rooz exchanged an office building he owned at 1841 Berkeley Way in Berkeley (the Berkeley property) for an office building Kimmel owned at 390 South El Camino Real in San Mateo (the San Mateo property). In this tax deferred exchange, Rooz also received a no interest $445,000 note from Kimmel secured by a deed of trust on the Berkeley property. The note was due in 10 years, or upon the sale of the San Mateo property, whichever occurred first. The exchange agreement provided that should Kimmel sell the Berkeley property, Kimmel could transfer the $445,000 deed of trust to any other property he owned, provided the total value of the loans secured by the other property (including the $445,000 loan) did not exceed 80 percent of that property’s value. At the time the parties entered this exchange agreement, Kimmel also agreed to “master lease” the San Mateo property from Rooz for a period of 10 years, paying Rooz a net amount of $10,500 per month.
 
 [1]
 
 North American handled the escrow for the exchange through its escrow officer, Marie Weckerle (Weckerle).
 

 Shortly after the exchange closed on February 6,1990, Kimmel contracted to sell the Berkeley property to a third party. At about the same time, Rooz
 
 *578
 
 concluded the amount of the original note and deed of trust he obtained in the exchange—$445,000—was in error and should have been higher. He brought this error to Kimmel’s attention, and they agreed to increase the obligation to $515,000 to correct the error. Consequently, Rooz and Kimmel agreed to replace the $445,000 deed of trust on the Berkeley property, which was subject to a pending sale, with a new deed of trust for the correct amount of $515,000. The new deed of trust was to be recorded against San Francisco commercial property known as the “Redstone Building” which Kimmel was in the process of purchasing. At the time the parties reached this agreement Kimmel had not yet obtained title to the Redstone Building. Nevertheless, in order to facilitate Kimmel’s sale of the Berkeley property, Rooz agreed to reconvey the $445,000 deed of trust subject only to Kimmel’s promise that the new $515,000 deed of trust would be recorded against the Redstone Building after Kimmel obtained title to that property.
 

 Rooz and Kimmel asked North American’s Weckerle, who was handling the escrow for Kimmel’s purchase of the Redstone Building, to record the reconveyance of the $445,000 deed of trust and to record the new $515,000 deed of trust against the Redstone Building. Weckerle agreed to do so as an “accommodation.” Weckerle explained that an “accommodation recording” means the title company is recording the document without liability since no title insurance will be issued to cover the transaction. Weckerle testified North American will not record a document as an accommodation unless the principals sign accommodation instructions and an indemnity agreement absolving North American of liability in connection with the recording.
 

 In this particular case, Rooz instructed North American that it was authorized to record a deed of reconveyance with respect to the $445,000 deed of trust “with no demand to the undersigned.” The instruction further stated: “You are instructed to re-draw said note and deed of trust against: 2916-2940 16th Street, San Francisco [the Redstone Building].” The new note and deed of trust were to be redrawn on the same terms as the original note and deed of trust except the principal amount was increased to $515,000. The instruction concluded: “Said deed of trust is to record as an accommodation with no title or escrow liability . . . and as per attached Indemnity and Recording Instructions.” The attached recording instructions provided: “[R]ecord against 2916-2940 16th Street, San Francisco as an accommodation,
 
 and after Kimmel takes title.”
 
 (Italics added.)
 

 Rooz also signed a “Master Agreement of Indemnification” (hereinafter indemnity and hold harmless agreement) which provided in part that he would “hold harmless, protect and indemnify [North American] from and against any and all liabilities, losses, damages, expenses, and charges . . .
 
 *579
 
 which may be sustained or incurred by [North American] under, or arising directly or indirectly out of the Recordings at requests of Indemnitor and resulting directly or indirectly from any claim, action, proceeding, judgment, order or process arising from or based upon or growing out of said Recordings of Documents.”
 

 Kimmel’s sale of the Berkeley property closed on February 20, 1990, and Weckerle recorded the deed reconveying the $445,000 deed of trust against that property on that date, thus extinguishing the security.
 

 Two days later, on February 22, 1990, Kimmel’s purchase of the Redstone Building closed and he took title to that property. Although Kimmel had previously signed the $515,000 note and deed of trust and they were in Weckerle’s possession, Weckerle nevertheless called Kimmel to obtain his authorization to record the new deed of trust against the Redstone Building. Kimmel refused to authorize the recording, explaining he had not yet completed his financing of the property. Consequently, Weckerle did not immediately record the $515,000 deed of trust. Because Rooz had left the country to return to Hungary, Weckerle informed Rooz’s agent and attorney-in-fact, Albert Kapkin, that she could not record the $515,000 deed of trust because of Kimmel’s instructions. Kapkin communicated this information to Rooz in Hungary.
 

 Weckerle refrained from recording the $515,000 deed of trust for nearly four months—until July 10, 1990—when Kimmel finally authorized her to do so. In the meantime, Kimmel added additional encumbrances to the Redstone Building, which he had purchased for $1.5 million subject only to a $975,000 first deed of trust. Between the time he took title to the Redstone Building on February 22, 1990, and the time Weckerle finally recorded Rooz’s $515,000 deed of trust on July 10, 1990, Kimmel encumbered the Redstone Building with two additional deeds of trust totaling $1,050,000. Consequently, by the time Weckerle recorded the $515,000 deed of trust in fourth position, the Redstone Building was subject to approximately $2,025,000 in preexisting encumbrances. Although Weckerle was aware Kimmel was recording these additional deeds of trust, she did not inform Rooz or his agent Kapkin that Kimmel was placing additional encumbrances on the property.
 
 [2]
 

 
 *580
 
 Ultimately, the optimism of the 1980’s met the reality of the early 1990’s and the second deed of trust holder foreclosed on the Redstone Building, thereby extinguishing Rooz’s fourth deed of trust.
 

 Because Rooz believed Kimmel and North American had wrongly impaired his security on the $515,000 note, he sued them for breach of oral agreement, negligence, breach of fiduciary duty, fraud and civil conspiracy.
 

 At the bench trial, Rooz’s escrow expert testified that a reasonable escrow customer would construe the term “after Kimmel takes title” as used in the recording instructions to mean the new deed of trust would be recorded
 
 immediately
 
 after Kimmel took title to the Redstone Building. Moreover, the expert testified that once Weckerle recorded the deed of reconveyance she had “fulfilled the obligation that she had to Mr. Kimmel.” At that point she became Rooz’s agent and her sole remaining duty was to record the deed of trust against the Redstone Building. According to the expert, there was “no necessity to obtain [Kimmel’s] permission to record the deed of trust. As soon as the Deed of Reconveyance [was] recorded, [Weckerle’s] dut[y] to Mr. Kimmel. . . [had] been completed and then her duty [was] to Mr. Rooz to record the deed of trust against the Redstone property.” The expert testified that, at that point, Kimmel had no power to prevent Weckerle from recording the new deed of trust. Even in the face of his objections, a “reasonably prudent escrow officer” would have immediately recorded the new deed of trust. Finally, the expert noted that, in the absence of an indemnity agreement, the pertinent standard of care would not change even if this were an “accommodation recording.” Finally, Kimmel’s own escrow expert testified a “reasonable title officer” would have recorded the new deed of trust “within a féw days” of Kimmel taking title to the Redstone Building.
 

 At the end of the bench trial, the trial court issued an informal written decision, a formal statement of decision upon Rooz’s request, and a “modification/clarification” to the statement of decision at North American’s request. The court found in favor of Rooz and against defendant Kimmel on the causes of action for breach of oral agreement and negligence only. The court ordered Kimmel to pay Rooz $114,834.99 in damages.
 

 With respect to the causes of action against respondent North American, the court impliedly found North American would have been liable for negligence and breach of oral contract for failing to timely file the $515,000
 
 *581
 
 deed of trust once escrow closed, but concluded the indemnity and hold harmless agreement “Absolve[d] [North American] of liability in this action.”
 
 [3]
 
 Consequently, the court entered judgment in favor of North American on all causes of action.
 

 Rooz thereafter filed a motion to vacate the judgment or, alternatively, for new trial. On July 14,1995, the trial court struck one sentence of its informal statement of decision, but otherwise denied Rooz’s motion to vacate the judgment or for new trial. Rooz then filed this timely appeal. (Cal. Rules of Court, rule 3(a).)
 

 II
 

 Discussion
 

 A.
 
 The Indemnity and Hold Harmless Agreement Absolved North American of Liability for Its Own Negligence.
 

 Rooz contends the trial court erred when it found the indemnity and hold harmless agreement absolved North American of liability for its own negligence. In a nutshell, Rooz contends: (1) the indemnity and hold harmless agreement does not specifically absolve North American of liability resulting from its own negligence; (2) such specific language is absolutely
 
 *582
 
 required to absolve a defendant of damages resulting from its own active negligence; and (3) North American was actively negligent when it failed to record the deed of trust immediately after Kimmel took title to the Redstone Building. (See
 
 Markley
 
 v.
 
 Beagle
 
 (1967) 66 Cal.2d 951, 962 [59 Cal.Rptr. 809, 429 P.2d 129];
 
 Western Gulf Oil Co.
 
 v.
 
 Oilwell Service Co.
 
 (1963) 219 Cal.App.2d 235, 242-243 [33 Cal.Rptr. 20].)
 

 We reject Rooz’s argument. As we explain below, California courts no longer adhere to the mechanical rules Rooz relies on. Instead, the issue before us is whether, based on the circumstances of the case, the parties “knowingly bargained] for the protection at issue.”
 
 (Rossmoor Sanitation, Inc.
 
 v.
 
 Pylon, Inc.
 
 (1975) 13 Cal.3d 622, 633 [119 Cal.Rptr. 449, 532 P.2d 97]
 
 (Rossmoor).)
 

 1)
 
 The Law.
 

 Both parties cite to cases that construe contractual indemnification provisions. We note that, strictly speaking, this case does not involve interpretation of an indemnification provision. Indemnity involves “ ‘the obligation resting on one party to make good
 
 a loss or damage
 
 another party has incurred.’ ”
 
 (Maryland Casualty Co.
 
 v.
 
 Bailey & Sons, Inc.
 
 (1995) 35 Cal.App.4th 856, 864 [41 Cal.Rptr.2d 519], italics added
 
 (Maryland Casualty).)
 
 Here, North American is not seeking indemnification. Instead, North American relies on the general “hold harmless” provision in the indemnity and hold harmless agreement to prevent Rooz from directly recovering against North American for damage he incurred as a result of North American’s own negligence.
 
 [4]
 
 Thus, in this case, the pertinent agreement is best viewed as a “release of liability” as opposed to an indemnity agreement. (See, e.g.,
 
 Westlye
 
 v.
 
 Look Sports, Inc.
 
 (1993) 17 Cal.App.4th 1715, 1726, 1731-1733, 1755 [22 Cal.Rptr.2d 781];
 
 Ferrell
 
 v.
 
 Southern Nevada Off-Road Enthusiasts, Ltd.
 
 (1983) 147 Cal.App.3d 309, 312, 314 [195 Cal.Rptr. 90];
 
 John E. Branagh & Sons
 
 v.
 
 Witcosky
 
 (1966) 242 Cal.App.2d 835, 838 [51 Cal.Rptr. 844].) Although we note this distinction, the cases have held that the general rules for construing indemnity provisions apply to exculpatory clauses as well. (See
 
 Ferrell
 
 v.
 
 Southern Nevada Off-Road Enthusiasts, Ltd., supra,
 
 147 Cal.App.3d at pp. 318-319 [applying cases interpreting indemnification agreements to a release of liability contract];
 
 Philippine Airlines, Inc.
 
 v.
 
 McDonnell Douglas Corp.
 
 (1987) 189 Cal.App.3d 234, 238 [234 Cal.Rptr. 423] [same];
 
 Salton Bay Marina, Inc.
 
 v.
 
 Imperial Irrigation Dist.
 
 (1985) 172 Cal.App.3d 914, 932-933, fn. 3 [218 Cal.Rptr. 839] [same].)
 

 
 *583
 
 We must determine the scope of a contractual duty of indemnification or release of liability from the contract itself. An indemnity agreement may provide for indemnification against an indemnitee’s own negligence, but such an agreement must be clear and explicit and is strictly construed against the indemnitee. If an indemnity clause does not specifically address the issue of an indemnitee’s negligence, it is referred to as a “general” indemnity clause. While courts may construe such general indemnity clauses to provide indemnity for losses resulting from an indemnitee’s “passive” negligence, as a general rule courts in the past have refused to allow indemnification for “active” negligence.
 
 [5]
 

 (Rossmoor, supra,
 
 13 Cal.3d at p. 628;
 
 Morton Thiokol, Inc.
 
 v.
 
 Metal Building Alteration Co.
 
 (1987) 193 Cal.App.3d 1025, 1028 [238 Cal.Rptr. 722]
 
 (Morton
 
 Thiokol);
 
 Maryland Casualty, supra,
 
 35 Cal.App.4th at p. 867.)
 

 Although it has been the general rule that a party will not be indemnified for his or her own active negligence under a general indemnity agreement,
 
 [6]
 
 our Supreme Court, while acknowledging this general rule, has held that “whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts.”
 
 (Rossmoor, supra,
 
 13 Cal.3d at p. 633;
 
 Morton Thiokol, supra,
 
 193 Cal.App.3d at p. 1028.) “Decisions by the Courts of Appeal predating
 
 Rossmoor
 
 employed the same pragmatic approach.”
 
 (Morton Thiokol, supra,
 
 193 Cal.App.3d at p. 1029; see, e.g.,
 
 Atchison, T. & S. F. Ry. Co.
 
 v.
 
 James Stewart Co.
 
 (1966) 246 Cal.App.2d 821, 826 [55 Cal.Rptr. 316] [“Considering the text of the writing and the relationship of the parties, no one could doubt that the accident
 
 *584
 
 which occurred was exactly the kind of hazard which was contemplated by the parties, and against which the railway was promised protection.”].)
 

 Recent cases have embraced the rule that the intent of the parties controls and have found indemnity agreements apply to the indemnitee’s active negligence even where the indemnity agreement does not expressly address the issue of the indemnitee’s negligence. For example, in
 
 Morton Thiokol, supra,
 
 193 Cal.App.3d 1025 the indemnity clause in a roofing contract provided the contractor “
 
 ‘agrees to indemnify and hold harmless the Owner
 
 [indemnitee]
 
 and its agents and employees from any and all liability, loss, damage, cost and expense
 
 . . .
 
 sustained by reason of Contractor’s
 
 breach of warranty, breach of contract, misrepresentation or false certification, or failure to exercise due care.’ ” (193 Cal.App.3d at p. 1027, italics in original.) The indemnification clause did not address the issue of the
 
 owner’s
 
 breach of the duty of due care. However, the contract did require the contractor to use appropriate safety measures. A worker was injured during the course of the construction due to the contractor’s negligence in failing to follow safety precautions
 
 and
 
 the owner’s negligence in allowing the roof to become slick with salt; the worker sued and recovered against the contractor
 
 and
 
 the owner based on the owner’s
 
 own
 
 “active” negligence. The owner sought indemnification from the contractor.
 
 (Id.
 
 at pp. 1027-1029.) The contractor argued the active negligence exception should apply, because the indemnity agreement did not expressly address the issue of the owner’s negligence. The
 
 Morton Thiokol
 
 court rejected this argument, stating: “[D]enying indemnity here would deprive the indemnitee of the benefit of its bargain and read out of the contract essential provisions intended by the parties to govern their relationship, in violation of the principle that contracts should be read in a manner which renders them reasonable and capable of being put into effect. [Citations.] In so concluding we are faithful to our high court’s admonition in
 
 Rossmoor Sanitation, Inc.
 
 v.
 
 Pylon, Inc., supra,
 
 13 Cal.3d 622 that the active-passive rubric ought not to be wholly dispositive, but that instead the enforceability of an indemnity agreement shall primarily turn upon a reasonable interpretation of the intent of the parties.
 
 (Id.
 
 at p. 633.) Where, as here, the agreement clearly indicates that one party was to be indemnified for any damages sustained as a result of another’s breach of the contract, and it is undisputed that the accident would never have happened except for such breach, we conclude that the indemnity is viable notwithstanding the jury’s finding of the indemnitee’s ‘active’ negligence.”
 
 (Morton Thiokol, supra,
 
 193 Cal.App.3d at p. 1030, fn. omitted; see also
 
 Hernandez
 
 v.
 
 Badger Construction Equipment Co.
 
 (1994) 28 Cal.App.4th 1791, 1820-1822 [34 Cal.Rptr.2d 732]
 
 (Hernandez)
 
 [“Although an indemnitee’s active negligence may ordinarily preclude its recovery under a general indemnity agreement, the Supreme Court has cautioned against a strict application of such rule.”].)
 

 
 *585
 
 Recently, in
 
 Maryland Casualty, supra,
 
 35 Cal.App.4th at page 869 the court noted
 
 Rossmoor, Morton Thiokol
 
 and
 
 Hernandez
 
 “recognized the general rule that an actively negligent tortfeasor cannot recover under a general indemnity provision . . . that is silent on the issue of the indemnitee’s negligence. [Citations.] These decisions made clear, however, that the general rule may not always apply and is merely a tool to be used to ascertain the intent of the parties.” We agree with this interpretation of recent case law.
 

 2)
 
 Analysis.
 

 Because the trial court construed the indemnity and hold harmless provision without the aid of conflicting extrinsic evidence, the interpretation of that agreement is a question of law for this court.
 
 (Maryland Casualty, supra,
 
 35 Cal.App.4th at p. 868;
 
 Parsons
 
 v.
 
 Bristol Development Co.
 
 (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)
 

 The indemnity and hold harmless agreement Rooz signed provided in pertinent part:
 

 “Whereas, The Company [North American] is being requested and will in the future be requested by Indemnitor [Rooz] to record for the benefit of Indemnitor various documents (hereinafter ‘Documents’), with legal effects) on real property, without benefit of examination of conformity of documents or real property title, such documents to be recorded with various county[] Recorder’s office(s) (hereinafter the act(s) of so recording said Documents . . . referred to as ‘Recordings’); and
 

 “Whereas, no benefit, business or otherwise, is derived by and for The Company by the Recordings, and Indemnitor acknowledges that The Company does not now nor will derive a benefit therefrom and Indemnitor further acknowledges that Indemnitor does and/or will derive a benefit from said Recordings; and
 

 “Whereas, The Company is unwilling to carry out and perform the Recordings; and
 

 “Whereas, the Indemnitor recognizes that The Company, in the normal course of its business, would not so carry out and perform the Recordings of Documents unless the Indemnitor indemnifies The Company as hereafter agreed.
 

 “Now, Therefore, the Indemnitor Agrees that in consideration of The Company’s Recordings of Documents at the present and future requests of
 
 *586
 
 Indemnitor, the Indemnitor will hold harmless, protect and indemnify The Company from and against any and all liabilities, losses, damages, expenses and charges . . . which may be sustained or incurred by The Company under, or arising directly or indirectly out of the Recordings at requests of Indemnitor and resulting directly or indirectly from any claim, action, proceeding, judgment, order or process arising from or based upon or growing out of said Recordings of Documents.
 

 “And the Indemnitor Further Agrees that The Company is hereby granted the right to rely upon this Agreement in Recordings of Documents, both now and in the future . . . .”
 

 Given the commercial reality of the accommodation recording in this case, we conclude the parties intended by this agreement to release North American from liability for its
 
 own
 
 negligence in recording the documents, and this release applied whether that negligence is deemed “active” or “passive.” First, North American made it clear to Rooz that it was not deriving any commercial benefit from the accommodation recording; North American was recording the documents as a “favor” to Rooz and Kimmel. Second, North American made it clear that it was generally unwilling to carry out accommodation recordings and would do so only if Rooz agreed to fully indemnify the company and hold it harmless “from and against any and all
 
 liabilities
 
 . . . which may be sustained or incurred by The Company under, or arising directly or indirectly out of the Recordings . . . .” This language was broad enough to encompass liability arising from North American’s own active negligence. In short, the document clearly informed Rooz that North American would record the documents as an “accommodation,” without commercial benefit, only if Rooz promised to release and indemnify North American from all potential liability. In our view, denying North American the benefit of its release in these circumstances would deprive it “of the benefit of its bargain and read out of the contract essential provisions intended by the parties to govern their relationship, in violation of the principle that contracts should be read in a manner which renders them reasonable and capable of being put into effect.”
 
 (Morton Thiokol, supra,
 
 193 Cal.App.3d at p. 1030.)
 

 Thus, we agree with the trial court that the indemnity and hold harmless agreement “clearly, explicitly and comprehensively sets forth the intent and
 
 *587
 
 effect of the document... to absolve North American . . . from liability to” Rooz.
 
 [7]
 

 We also reject Rooz’s argument that, even if the indemnity and hold harmless agreement does apply to active negligence, it is “limited in its scope." Here, North American’s liability for negligence clearly arose “directly or indirectly out of the Recordings at requests of Indemnitor and resulting directly or indirectly from any claim, action, proceeding, judgment, order or process
 
 arising from or based upon or growing out
 
 of said Recordings of Documents.” (Italics added.) The fact the negligence preceded the actual recording did not render the hold harmless clause inapplicable.
 

 B.
 
 The Trial Court Did Not Find North American Had Committed Fraud.
 

 Rooz next contends the indemnity and hold harmless agreement did not shield North American from its own fraud, and North American committed fraud when it failed to record the deed of trust in second position. (See
 
 Maxon
 
 v.
 
 Security Ins. Co.
 
 (1963) 214 Cal.App.2d 603, 608-610 [29 Cal.Rptr. 586]; Civ. Code, § 1668.) This argument fails, however, because the trial court never found North American had committed fraud and Rooz never requested such a finding. Moreover, although Rooz pleaded a cause of action for fraud against North American, the trial court entered judgment in favor of North American on all causes of action, thus implicitly finding North American had not committed fraud. We are bound by that implicit finding.
 
 (In re Marriage of Arceneaux
 
 (1990) 51 Cal.3d 1130, 1132-1134 [275 Cal.Rptr. 797, 800 P.2d 1227] [where statement of decision is silent on issue and no request is made by appealing party for finding on that issue, reviewing court will imply findings that support the judgment];
 
 Sammis
 
 v.
 
 Stafford
 
 (1996) 48 Cal.App.4th 1935, 1942 [56 Cal.Rptr.2d 589];
 
 In re Marriage of Nichols
 
 (1994) 27 Cal.App.4th 661, 671 [33 Cal.Rptr.2d 13].)
 

 C.
 
 The Indemnity and Hold Harmless Agreement Is Not Against the Public Interest.
 

 Rooz next contends that, even if the indemnity and hold harmless agreement purported to absolve North American of liability for its own active negligence, such an agreement is unenforceable because it is against the public interest. We disagree.
 

 Rooz cites
 
 Tunkl
 
 v.
 
 Regents of University of California
 
 (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]
 
 (Tunkl)
 
 and
 
 Akin
 
 v.
 
 *588
 

 Business Title Corp.
 
 (1968) 264 Cal.App.2d 153 [70 Cal.Rptr. 287]
 
 (Akin)
 
 to support his argument.
 

 In
 
 Tunkl,
 
 the Supreme Court held a release from liability for future negligence may violate the public interest in certain circumstances. In particular, the court stated: “In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.” (60 Cal.2d at pp. 98-101, fns. omitted.)
 

 The
 
 Tunkl
 
 court continued: “While obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, the above circumstances pose a different situation. In this situation the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer. Since the service is one which each member of the public, presently or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of a compulsory assumption of the risk of another’s negligence.” (60 Cal.2d at p. 101.) Based on the factors cited above, the Supreme Court concluded a clause in an admission form that purported to release a nonprofit hospital from liability for its negligence to a patient violated the public interest and was unenforceable.
 
 (Id.
 
 at pp. 94, 101-102.)
 

 In
 
 Akin, supra,
 
 264 Cal.App.2d 153, Division Four of the Second District Court of Appeal applied the
 
 Tunkl
 
 factors to a standard escrow transaction.
 
 *589
 
 The plaintiff/seller in
 
 Akin
 
 opened an escrow with Business Title Corporation to handle the sale of a restaurant. The title company recorded a chattel mortgage the plaintiff received in the transaction in the wrong county, and when the buyer went bankrupt that security was not available to the plaintiff. (264 Cal.App.2d at pp. 154-155.) The title company attempted to escape liability for its negligence by relying on an exculpatory provision in its escrow agreement.
 

 The
 
 Akin
 
 court stated: “In comparing the[] six criteria set forth in
 
 Tunkl
 
 to the case at bench we find that
 
 the transaction before us
 
 is also one that ‘affects the public interest.’ ”
 
 (Akin, supra,
 
 264 Cal.App.2d at p. 156, italics added.) The court then analyzed each of the six
 
 Tunkl
 
 criteria and found each of them militated in favor of the conclusion that the specific transaction before it was one affecting the public interest.
 
 (Id.
 
 at pp. 156-157.) The
 
 Akin
 
 court did not hold—as Rooz suggests—that
 
 all
 
 transactions conducted by title companies necessarily affect the public interest.
 

 Whether a particular transaction or contract affects the public interest depends upon the circumstances of the particular transaction or contract. (See, e.g.,
 
 Randas
 
 v.
 
 YMCA of Metropolitan Los Angeles
 
 (1993) 17 Cal.App.4th 158, 161 [21 Cal.Rptr.2d 245];
 
 Loughrin
 
 v.
 
 Superior Court
 
 (1993) 15 Cal.App.4th 1188, 1193-1194 [19 Cal.Rptr.2d 161] [“We find that none of the characteristics cited in
 
 Tunkl
 
 as creating a ‘public interest’ exists in the typical private real estate purchase and sale transaction.”];
 
 McCarn
 
 v.
 
 Pacific Bell Directory
 
 (1992) 3 Cal.App.4th 173, 179-181 [4 Cal.Rptr.2d 109] [provision exculpating phone directory provider from negligence upheld as not violating public interest];
 
 Appalachian Ins. Co.
 
 v.
 
 McDonnell Douglas Corp.
 
 (1989) 214 Cal.App.3d 1, 27-28 [262 Cal.Rptr. 716].) Moreover, a court will invalidate an exculpatory clause only where “all or most of the[]
 
 [Tunkl]
 
 circumstances exist.”
 
 (Belshaw
 
 v.
 
 Feinstein
 
 (1968) 258 Cal.App.2d 711, 726 [65 Cal.Rptr. 788].) In this case, we conclude only one of the
 
 Tunkl
 
 factors applies to the accommodation recording that is the subject of this lawsuit. We therefore hold that the specific transaction before us does not “affect the public interest” as that phrase has been defined in
 
 Tunkl.
 

 We concede the first factor—that the title and escrow business is of a type generally thought suitable for public regulation—applies in this case. However, the remaining factors must be viewed in light of the specific transaction at issue here—an accommodation recording for which North American received no consideration and no commercial benefit. Moreover, the transaction did not require North American to set up a formal escrow, or provide title insurance or a title report. Thus, this case is distinguishable from
 
 Akin
 
 
 *590
 
 where the title company set up a formal escrow, and presumably sold title insurance and received a fee for its services. Instead, the only service North American promised to perform was to simply record the deed of reconveyance and the new deed of trust. Unlike the other services North American provides—such as a formal escrow or title insurance—the simple act of recording a document can be performed by any person with a minimum amount of familiarity with real estate transactions.
 

 Viewed in this light, it is clear the second factor—“[t]he party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public”—does not apply.
 
 (Tunkl, supra,
 
 60 Cal.2d at pp. 98-99, fn. omitted.) Although this may be true with respect to North American’s
 
 other
 
 services (e.g., title insurance and title reports), it is not true with respect to a simple accommodation recording, which essentially anyone can perform.
 

 Nor does the third factor apply to this case. North American does not hold itself out as willing to perform accommodation recordings for any member of the public or even for any member coming within certain established standards. Instead, the indemnity and hold harmless agreement specifically states North American is generally “unwilling to carry out and perform” accommodation recordings and [^] “in the normal course of its business, would not so carry out” accommodation recordings, and will do so only if the party requesting the recording agrees to sign the indemnity and hold harmless agreement. In fact, this appears to be standard practice throughout the industry.
 

 The fourth factor is likewise inapplicable. This is not a case where, “[a]s a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.”
 
 (Tunkl, supra,
 
 60 Cal.2d at pp. 99-100.) Here, the accommodation recording at issue is not essential, and the title company does not possess a decisive advantage of bargaining strength, because any member of the public may simply choose to record the document personally.
 

 Nor did North American confront the public with a standardized adhesion contract of exculpation without making provision by which a customer could pay additional reasonable fees and obtain protection against negligence. Here, Weckerle testified that, if he had elected to do so, Rooz could have opened a formal escrow, purchased title insurance, and thus insured the second position of his $515,000 deed of trust. Had he done so, Rooz would not have been required to sign the indemnity and hold harmless agreement.
 

 
 *591
 
 Finally, although as a result of the transaction, Rooz’s property was initially placed under the control of North American, subject to the risk of its carelessness, North American immediately informed Rooz’s agent when it learned it could not record the deed of trust because Kimmel had objected. There is no evidence Rooz or his agent then made any effort to force North American to record the deed of trust, or to reclaim control of the deed of trust and to record it themselves.
 

 In sum, this was a “voluntary transaction[] in which one party, for a consideration, agree[d] to shoulder a risk which the law would otherwise have placed upon the other party.” That consideration was North American’s agreement to record the pertinent documents without charge. In our view, Rooz “really [did] acquiesce voluntarily in the contractual shifting of the risk” and received consideration for the transfer—namely, free recording services. (Tunkl,
 
 supra,
 
 60 Cal.2d at p. 101.)
 

 D.
 
 The Findings in the Summary Adjudication Proceeding.
 

 Prior to trial, North American moved for summary judgment, or in the alternative, summary adjudication of issues. North American claimed primarily that it did not owe a duty of due care (or any other duty) to Rooz as a matter of law. Rooz did not move for summary judgment or summary adjudication of issues on his own behalf. The only papers he filed were in opposition to North American’s motions. Nowhere did Rooz ask the trial court to summarily adjudicate any issues on his behalf.
 

 Nevertheless, the law and motion judge’s memorandum decision stated: “Both Summary Adjudication Motion and Summary Judgment Motion are denied.
 
 No triable issues of fact remain as to Plaintiffs [Rooz’s] additional facts 18 through 24, inclusive, supported by Plaintiffs declaration and cited references to page 162 of Kapkin[’s] deposition.”
 
 (Italics added.) The trial court did not explain why it was ruling in favor of Rooz on these issues when Rooz had not filed his own motion for summary adjudication.
 
 [8]
 

 The “additional facts” to which the law and motion judge referred are found in Rooz’s separate statement of disputed and undisputed facts in
 
 *592
 
 opposition to the motion for summary judgment. In that statement Rooz listed 17 factual issues he claimed were “disputed” and 7 facts (18 through 24) he claimed were “undisputed.” The allegedly undisputed facts were: “18. [North American] drafted instructions requiring that Plaintiff’s Deed of Trust securing his $515,000.00 Note against Redstone was to be recorded in place of his Deed of Trust securing the $445,00.00 Deed of Trust against Berkeley. The Redstone Deed of Trust was to be recorded after Kimmel took title to Redstone. HD 19. Plaintiff forwent obtaining Title Insurance at Marie Weckerle’s recommendation. [<f] 20. Plaintiff’s reconveyance of the Deed of Trust on the Berkeley Property was done on reliance on Marie Weckerle’s recommendation that Plaintiff would have a Second Deed of Trust on Redstone. ['JO 21. Marie Weckerle advised Plaintiff that Kimmel was putting $500,000.00 of his own money into an escrow Marie Weckerle was handling at [North American] for the purchase of Redstone. [<JQ 22. Marie Weckerle or employees of [North American] drafted the escrow instructions regarding the recordation of Plaintiff’s Deed of Trust against Redstone. [<JD 23. Albert Kapkins’s [sic] actions were limited to inquiring of [North American] and Marie Weckerle whether Plaintiff’s Redstone Deed of Trust had been recorded.
 
 m
 
 24. Albert Kapkin did not, at anytime, instruct Marie Weckerle or anyone else at [North American] either to delay recording or not to record the Plaintiff’s Deed of Trust against Redstone.”
 

 Rooz contends the trial court prejudicially erred when it “ignored” the earlier summary adjudication of issues. We reject this contention for several reasons.
 

 First, Rooz has not cited to a single instance in which he raised this issue at trial. He correctly points out that, under the former version of Code of Civil Procedure section 437c, the courts held that where “summary adjudication of issues is granted by one judge and the remaining issues are tried by a different judge, the second judge is bound by the first judge’s determination, and the losing party may not seek relitigation of the decided issues before the second judge. (See
 
 Conway
 
 v.
 
 Bughouse, Inc.
 
 (1980) 105 Cal.App.3d 194, 202-203. . . .)”
 
 (Pacific Std. Life Ins. Co.
 
 v.
 
 Tower Industries, Inc.
 
 (1992) 9 Cal.App.4th 1881, 1887 [12 Cal.Rptr.2d 524].) However, assuming this is still the law,
 
 [9]
 
 this rule does not relieve an appellant of his usual duty to raise the issue at trial in order to preserve it for appeal.
 

 
 *593
 
 In effect, Rooz is contending North American was estopped from relitigating factual issues 18 through 24 at trial because those factual issues had already been decided by the law and motion judge. However, Rooz never brought the alleged “summary adjudication” order to the trial court’s attention, never alleged that issues 18 through 24 had already been decided, and never urged the “summary adjudication” order as a basis for obtaining a new trial.
 
 [10]
 
 In these circumstances it would be fundamentally unfair to permit Rooz to raise this issue at this late date. Rooz had the duty to look after his legal rights and to call any infringement of them to the trial court’s attention.
 
 (Doers
 
 v.
 
 Golden Gate Bridge etc. Dist.
 
 (1979) 23 Cal.3d 180,184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261];
 
 North Coast Business Park
 
 v.
 
 Nielsen Construction Co.
 
 (1993) 17 Cal.App.4th 22, 28-29 [21 Cal.Rptr.2d 104];
 
 Menefee
 
 v.
 
 County of Fresno
 
 (1985) 163 Cal.App.3d 1175, 1182 [210 Cal.Rptr. 99].) He failed to do so in this case.
 

 Second, although we have concluded Rooz may not raise this issue in any event, we note in passing that even if the trial court had faithfully adhered to the law and motion judge’s alleged summary adjudication of issues, it would not have made any difference to the ultimate result, as the decision in favor of North American was based on the validity of the hold harmless agreement, not on any lack of negligence or duty on North American’s part.
 

 Finally, the law and motion judge had no authority under the new statute to find that “[n]o triable issues of fact remain” with respect to the delineated issues of fact. The new statute states “[a] motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty.” (Code Civ. Proc., § 437c, subd. (f)(1).) Here, the law and motion judge did not purport to “completely dispose of a cause of action, an affirmative defense, a claim for damages, or an issue of duty.” Instead, he at most found there was no triable issue with respect to certain issues of fact. The court did not purport to draw a legal conclusion from those facts which conclusively disposed of a cause of action or an issue of duty. Thus, his findings were not authorized
 
 *594
 
 by the current summary adjudication statute.
 
 [11]
 
 (See
 
 Transamerica Ins. Co.
 
 v.
 
 Superior Court
 
 (1994) 29 Cal.App.4th 1705, 1713 [35 Cal.Rptr.2d 259];
 
 Regan Roofing Co.
 
 v.
 
 Superior Court
 
 (1994) 24 Cal.App.4th 425, 432-433 [29 Cal.Rptr.2d 413].)
 

 In sum, for the reasons discussed above, we reject Rooz’s contention the trial court improperly ignored factual findings that had been summarily adjudicated before trial.
 

 E.
 
 Damages.
 

 Finally, Rooz contends the trial court erred when it calculated his damages as $114,834.99. He contends the trial court should have awarded damages for the full value of the new deed of trust: $515,000. Since we have concluded respondent North American is not liable to Rooz, this issue is moot as to that respondent. Consequently, we address the damages issue only as it pertains to respondent Kimmel.
 
 [12]
 

 The trial court calculated damages using the formula from
 
 Stephans
 
 v.
 
 Herman
 
 (1964) 225 Cal.App.2d 671 [37 Cal.Rptr. 746].
 
 Stephans
 
 holds the measure of damages for loss or impairment of security is the fair market value of the property securing the promissory note as of the date of the loss or impairment of the security, less prior liens and taxes, not to exceed the amount due on the note. In other words, the measure of damages for loss or impairment of security is the
 
 actual
 
 value of the security in the property at the time the security was lost or impaired, but no more than the value of the secured note. (See also
 
 Foggy
 
 v.
 
 Ralph F. Clark & Associates, Inc.
 
 (1987) 192 Cal.App.3d 1204, 1214 [238 Cal.Rptr. 130];
 
 Howe
 
 v.
 
 City Title Ins. Co.
 
 (1967) 255 Cal.App.2d 85, 87 [63 Cal.Rptr. 119].) Rooz concedes this is the proper measure of damages. However, he claims the trial court misapplied this formula because it based its calculations on the original $445,000 note and the value of the security in the Berkeley property. Rooz contends the trial court should have based its calculations on the replacement $515,000 note and the value of the security Rooz would have had in the Redstone
 
 *595
 
 Building had the new deed of trust been recorded in second (as opposed to fourth) position. Rooz also contends the trial court erred when it reduced the damages to present value.
 

 1)
 
 The Trial Court Erred by Basing Damages on the Value of the Security in the Berkeley Property.
 

 The trial court calculated damages as follows. It found the fair market value of the Berkeley property at the time of the loss was $1.9 million. The property was subject to a first and second deed of trust totaling $1,521,000, and to Rooz’s third deed of trust for $445,000. Thus, the actual value of Rooz’s security in his third deed of trust on the Berkeley property was only $379,000 ($1,900,000 - $1,521,000 = $379,000). Consequently, the trial court calculated Rooz’s damages for the loss of his security in the Berkeley property at $379,000. Because the $445,000 note paid no interest and was due in 10 years, the trial court discounted the $379,000 in damages to a present value of $114,834.99, using a 12 percent rate of return.
 

 Rooz contends the court should have based his damages on the value of the new $515,000 note and deed of trust and the amount of security he would have had in the Redstone Building if the deed of trust had been recorded in second position. The evidence showed that, at the time Kimmel acquired title to the Redstone Building, it had a fair market value of $2,975,000 and was subject to a $975,000 first deed of trust. Thus, if Kimmel had permitted North American to record the $515,000 deed of trust in second position, the “fair market value of the property securing the [$515,000] promissory note as of the date of the loss of security, less prior liens and taxes” would have been $2 million. Consequently, since the note was over-secured, Rooz’s damages would have been the full amount of the secured promissory note, or $515,000.
 

 We conclude Rooz is correct on this point. Rooz agreed Kimmel could remove the $445,000 deed of trust against the Berkeley property
 
 before
 
 Kimmel acquired title to the Redstone Building. Thus, neither Kimmel nor North American breached a contract or tort duty to Rooz when they recorded the reconveyance of the $445,000 deed of trust against the Berkeley property. The breach came later, when Kimmel refused to permit North American to record the new $515,000 deed of trust in second position on the Redstone Building. It was that breach that led to the impairment of Rooz’s security by moving it from second to fourth position. Presumably, had Rooz been in second position, his $515,000 note would have been fully secured
 
 *596
 
 (or at least better secured) when the Redstone Building was sold in foreclosure.
 
 [13]
 

 Consequently, we agree with Rooz that the basis of his damages should have been the full value of the replacement note, or $515,000, since it was the security for that obligation which Kimmel’s breach of contract and negligence impaired.
 

 2)
 
 The Trial Court Erred by Reducing the Damages to Present Value.
 

 Finally, Rooz contends the court erred when it reduced the damages to their present value. This claim has merit as well.
 

 As indicated, the court apparently reduced the damages awarded to their present value because the note paid no interest and was not due until the year 2000. The court utilized a 12 percent annual rate of return to calculate present value.
 
 [14]
 

 The $515,000 note, like the $445,000 note, was due February 6, 2000, and was at 0 percent interest. However, the note and deed of trust were subject to a “due on sale clause” which provided: “If the trustor shall convey or alienate said property or any part thereof or any interest therein or shall be divested of his title in any manner or way, whether voluntary or involuntary any indebtedness . . . irrespective of the maturity date expressed in any note evidencing the same, at the option of the holder hereof and without demand or notice shall become due and payable immediately.” Thus, the $515,000 note became due when the second deed of trust holder foreclosed on the Redstone Building in 1992.
 

 We have not discovered any authority where a court has reduced damages to present value in circumstances similar to those before us. The cases that have awarded damages under the
 
 Stephans
 
 v.
 
 Herman
 
 formula have not reduced damages to present value. (See
 
 Stephans
 
 v.
 
 Herman, supra,
 
 225 Cal.App.2d at pp. 674-675;
 
 Howe
 
 v.
 
 City Title Ins. Co., supra,
 
 255 Cal.App.2d at pp. 87-88.) To the contrary, the court in
 
 Howe
 
 rejected an attempt to reduce the amount of damages below the actual amount due on the note. There, the appellant argued: “
 
 ‘The court erred in finding that
 
 
 *597
 

 plaintiff was damaged in the full face amount of the note.'
 
 ” (225 Cal.App.2d at p. 87.) The court noted that “[t]he foregoing assignment of error seems premised upon a probability that plaintiff’s trust deed, being an inferior lien, was worth something less than the amount due thereon.”
 
 (Ibid.)
 
 The
 
 Howe
 
 court went on to note:
 
 “Stephans
 
 v.
 
 Herman, supra, 225
 
 Cal.App.2d 671, 673-674, fixes the measure of damages for negligent loss of real property security as follows: ‘The measure of damages for loss of security, properly resorted to by the trial court, is the fair market value of [the real property security] as of the date of conversion, less prior liens and taxes, not, however, to exceed
 
 the amount due on the
 
 note.’ We believe this standard is proper and in accord with the rule in negligence cases that the appropriate measure of damages ‘is the amount which will compensate for all the detriment proximately caused’ by the negligence. (Civ. Code, § 3333.) [H The record shows payment of $450 on plaintiff’s trust deed obligation which payment is not reflected in the judgment. The
 
 amount due on the note
 
 was therefore $5,800. Applying the
 
 Stephans
 
 v.
 
 Herman
 
 criteria, the judgment should have been for $5,800 principal . . . .”
 
 (Howe
 
 v.
 
 City Title Ins. Co., supra,
 
 255 Cal.App.2d at pp. 87-88, italics added.)
 

 Thus, the pertinent authorities indicate the damages should have been for the full amount “due on the note” (here $515,000) without discounting to present value. This is particularly logical in the present case because, by virtue of the “due on sale” clause, the full face amount of the note ($515,000) was due and owing at the time judgment was entered. Thus, this is not a case involving an award of future damages which should be discounted to present value.
 
 (American Bank & Trust Co.
 
 v.
 
 Community Hospital
 
 (1984) 36 Cal.3d 359, 369, fn. 9 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233];
 
 Rodriguez
 
 v.
 
 McDonnell Douglas Corp.
 
 (1978) 87 Cal.App.3d 626, 660-662 [151 Cal.Rptr. 399] [recognizing that awards for future damages may be discounted to present value].)
 

 Ill
 

 The amount Rooz is entitled to recover from Kimmel is increased to $515,000. In all other respects, the judgment is affirmed. The parties shall each bear their own costs on appeal.
 

 Phelan, P. J., and Walker, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied August 20, 1997.
 

 [1]
 

 The transaction was actually somewhat more complex than we have presented it, since the parties also agreed to act as partners for the purpose of acquiring the San Mateo property. They agreed to sell the San Mateo property after 10 years, or sooner upon mutual agreement, at which time they would share “50/50” in all profits after Rooz received the first $1,270,000 of the net proceeds of sale.
 

 [2]
 

 In fairness to Kimmel, although he had purchased the Redstone Building for only $1.5 million in February 1990, a formal appraisal of the Redstone Building in December 1989 had put its value at $2,975,000. Thus, assuming this appraisal was accurate, there would have been $435,000 in equity in the property even after Weckerle recorded Rooz’s $515,000 deed of trust. We note, however, that this still would not have met the requirement in the exchange agreement that the new property have no more than an 80 percent loan to value ratio after
 
 *580
 
 Rooz’s deed of trust was recorded. By our calculations, even based on the overly optimistic appraisal, the loans encumbering the Redstone Building equaled more than 85 percent of its value.
 

 [3]
 

 North American suggests the trial court actually found that it recorded the $515,000 deed of trust in a timely fashion, and thus North American would not have been liable even in the absence of the indemnity agreement. We cannot agree.
 

 In its original
 
 informal
 
 statement of decision the trial court did not specifically address whether North American had breached an oral agreement with Rooz or had been negligent in handling the recording of the $515,000 deed of trust. Instead, the court went directly to the issue of the indemnity agreement and concluded the agreement “absolves [North American] of liability in this case.” In his request for a formal statement of decision, Rooz specifically asked whether “North American
 
 failed
 
 to timely record the $515,000 Deed of Trust?” The trial court answered in finding No. 20, “Yes, per the testimony of all involved.” In its request for “Modification/Clarification” of the statement of decision, North American asked that the following language be added to finding No. 20: “[North American] recorded the $515,000 deed of trust against the Redstone property in a timely fashion
 
 after the conflicting instructions from Rooz and Kimmel had been resolved, and [North
 
 American]
 
 was authorized to record the $515,000 deed of trust.”
 
 (Italics added.) North American suggests that when the trial court adopted this modification it in effect overruled its earlier finding North American had failed to timely record the deed of trust for all purposes.
 

 It is difficult to believe this argument is made sincerely. The two findings were not inconsistent. Moreover, taken as a whole, the trial court’s informal statement of decision, formal statement of decision, and modified statement of decision indicate the trial court believed North American would have been liable in negligence but for the indemnity agreement. (See, e.g., finding No. 22 [“The finding regarding North American’s lack of liability to Plaintiff is based on the Indemnity Agreement, not on Mr. Kimmel’s instructions ----”].)
 

 [4]
 

 Again, the indemnity and hold harmless agreement provides Rooz will “hold harmless, protect and indemnify [North American] from and against any and all liabilities, losses, damages, expenses and charges . . . .”
 

 [5]
 

 “Passive negligence is found in mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law. [Citations.] Active negligence, on the other hand, is found if an indemnitee has personally participated in an affirmative act of negligence, was connected with negligent acts or omissions by knowledge or acquiescence, or has failed to perform a precise duty which the indemnitee had agreed to perform.” (Rossmoor,
 
 supra,
 
 13 Cal.3d at p. 629.)
 

 The trial court did not make a specific finding whether North American’s negligence was passive or active. However, given the definition quoted above, we believe North American’s negligence is best classified as “active” and will assume so for the purpose of argument.
 

 [6]
 

 It has been said that the original rationale for this rule was that an agreement of indemnification against one’s own negligence is not favored and, consequently, courts will not imply an agreement to indemnify an actively negligent indemnitee in the absence of express and implicit language.
 
 (Maryland Casualty, supra,
 
 35 Cal.App.4th at p. 866.) The same rationale applies to a general “hold harmless” agreement by which a potential defendant seeks to avoid liability for his own negligence. (See
 
 Westlye
 
 v.
 
 Look Sports, Inc., supra,
 
 17 Cal.App.4th at p. 1731;
 
 Ferrell
 
 v.
 
 Southern Nevada Off-Road Enthusiasts, Ltd., supra,
 
 147 Cal.App.3d at p. 318.)
 

 [7]
 

 We do not mean to suggest the indemnity and hold harmless agreement in this case should be used as a model for the title industry. To the contrary, the agreement could be improved by language specifically stating it applies to the title company’s own negligent acts (whether active or passive). (See, e.g.,
 
 Westlye
 
 v.
 
 Look Sports, Inc., supra,
 
 17 Cal.App.4th at p. 1725.)
 

 [8]
 

 Indeed, the favorable ruling on these issues apparently came as a surprise to Rooz’s counsel. He had prepared a proposed order denying the motion for summary judgment in which he listed 12 issues as to which “a triable controversy exists.” The proposed order did not list any issues in Rooz’s favor as to which counsel claimed there was no triable issue of fact. However, it appears the law and motion judge did not sign the proposed order. Instead, he issued his own memorandum decision in which he gratuitously found “No triable issues of fact remain as to Plaintiff’s [Rooz’s] additional facts 18 through 24, inclusive, supported by Plaintiff’s declaration and cited references to page 162 of Kapkin[’s] deposition.”
 

 [9]
 

 The cases we have cited relied on the former version of Code of Civil Procedure section 437c before it was amended in 1990. The 1990 amendments replaced summary adjudication of “issues” with summary adjudication of causes of action, defenses, affirmative defenses, unmeritorious claims for damages as defined in Civil Code section 3294 and lack of an owed duty.
 
 (Pacific Std. Life Ins. Co.
 
 v.
 
 Tower Industries, Inc., supra, 9
 
 Cal.App.4th at p. 1887, fn. 1.) The current statute provides: “A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an
 
 *593
 
 issue of duty.” (Code Civ. Proc., § 437c, subd. (f)(1).) The current motion for summary judgment was made under the post-1990 version of the statute. However, we need not determine whether the new version of the statute undermines the preexisting authority on this issue, as Rooz has failed to preserve the issue.
 

 [10]
 

 In fact, in his request for statement of decision, Rooz asked for specific findings on several of the factual issues that he now claims were conclusively determined by the prior “summary adjudication” of issues.
 

 [11]
 

 In light of our multiple reasons for rejecting Rooz’s claim, we will not address the notice and due process issues raised by the law and motion judge’s sua sponte decision to in effect grant a motion for summary adjudication when Rooz had not requested that relief.
 

 [12]
 

 Kimmel, who appeared in propria persona at trial, has not filed a brief on appeal. Although we have the discretion to automatically order reversal, treating appellant’s point as well taken
 
 {Berry
 
 v.
 
 Ryan
 
 (1950) 97 Cal.App.2d 492, 493 [217 P.2d 1015]), we follow the better practice of examining the record on the basis of appellant’s brief and reversing only if prejudicial error is found.
 
 {County of Los Angeles
 
 v.
 
 Surety Ins. Co.
 
 (1989) 207 Cal.App.3d 1126, 1128 [255 Cal.Rptr. 322];
 
 In re Marriage of Schultz
 
 (1980) 105 Cal.App.3d 846, 853 [164 Cal.Rptr. 653];
 
 Vo taw Precision Tool Co.
 
 v.
 
 Air Canada
 
 (1976) 60 Cal.App.3d 52, 55 [131 CaLRptr. 335].)
 

 [13]
 

 The parties have not cited to any evidence in the record showing what the Redstone Building sold for at foreclosure. However, we note the creditor that actually ended up in second position on the Redstone Building had a $350,000 deed of trust and foreclosed even though there was a $975,000 first against the property. Consequently, it appears there was considerable equity in the property above the first deed of trust.
 

 [14]
 

 Rooz’s own expert testified the return on an “80%” loan on the Redstone Building would have been between 12 and 16 percent.